THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD OLIVER, Defendant-Appellant.

First District (5th Division)   No. 1—91—2064

Opinion filed June 30, 1994.

Sidley & Austin, of Chicago (Timothy C. Kapshandy, Marjorie M. Golis, and Marc D. Berlin, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Carol A. Mengel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Harold Oliver (defendant) appeals his aggravated criminal sexual assault and armed robbery convictions, and the trial court's subsequent 60-year extended sentence for the aggravated criminal sexual assault charge and consecutive 30-year term for the armed robbery charge.

The issues presented on review are (1) whether the trial court's *voir dire* examination was sufficient, (2) whether the prosecution proved defendant guilty beyond a reasonable doubt, (3) whether the victim's pretrial identification of defendant from a lineup should have been admitted at trial, (4) whether the trial court's admission of semen/saliva test results constituted reversible error, and (5) whether the cumulative effect of allegedly erroneous evidentiary rulings denied defendant a fair trial.

We reverse the judgment and remand for a new trial.

## BACKGROUND

The trial court, during the *voir dire* examination, informed the venire that a grand jury indicted defendant with aggravated criminal sexual assault and armed robbery. The trial court then questioned the prospective jurors about their previous exposure to crime by asking them if they had anything against a person because he was charged with a crime, whether there was anything about the nature of the charges that would prevent them from rendering a fair and impartial decision, and whether they or people they knew had been victims of crime which would preclude them from being fair and impartial. Martin Lebedon (Mr. Lebedon) was the only prospective juror who indicated that he would be unable to be fair or impartial, and the trial court ultimately excused him. After further examination, the trial court swore-in a panel of jurors and proceeded with trial. At trial, S.S. (victim) testified that on January 24, 1989, defendant raped and robbed her at gunpoint. The victim lived on East 72nd Street and attended school at the Computer Learning Center located at 200 South Michigan Avenue. Dressed in a skirt, sweater, three-inch high heel shoes, and a black bomber jacket, she left her home at approximately 7:45 a.m. that morning. She carried a purse and book bag as she proceeded on foot to 71st and Jeffery to catch her bus.

Defendant suddenly came up from behind her, grabbed her around the neck with his left arm, and said, "Don't look at me, bitch." At the same time, defendant pushed a cold gun into the right side of her neck. The victim grabbed the dark colored handgun, looked up into defendant's face, and noticed that he was wearing glasses and that he had a scar on his face.

Defendant kept his arm around the victim's neck, with the gun up against her head, and ordered her to walk. As they walked across 72nd Street, defendant told the victim to take off her shoes. The victim obeyed and carried her shoes in her hand. Although defendant kept telling her not to look at him, the victim kept looking at him, noticing the scar on his face.

Defendant and the victim walked in and out of two driveways and then further east to a building. Defendant kicked the door open, took the victim into the vestibule of the building, and made her put her belongings on the ground in the middle of the vestibule. He then stood by the door with his gun and directed the victim to walk around the vestibule. The victim got a good look at defendant's face and realized that she recognized him as being "a man named Ralph." Her cousin had, years earlier, introduced defendant to her. She had also occasionally seen him at the YMCA.

After the victim walked across the vestibule, defendant commanded her to raise her skirt and pull down her pantyhose and panties. The victim, crying, was standing face to face with defendant as she followed his orders. Defendant then ordered her to take off her jacket and turn around. Defendant raised her sweater over her head and made her pull out her arms. Defendant then tied the back of her jacket in front of her face and tied her arms in back of her head.

The victim told defendant that it was the "time of the month." Defendant stuck his fingers inside of her vagina, twisted them, and said, "Bitch, you are lying." He then raped the victim by invading her vagina with his penis and having nonconsensual sexual intercourse with her. After defendant finished raping the victim, he made her walk by the door which led to the apartments. He then retorted, "Bitch, get on your knees." As the victim followed his directive, defendant said, "Bitch, you know what to do." Defendant told the victim to open her mouth, put his penis into her mouth, and grabbed her around the head. The victim could feel the gun against her head as defendant started pushing her head back and forth. Although defendant had tied the jacket around the victim's head, it kept falling down, enabling her to see defendant's face again. As defendant ejaculated into her mouth, the victim heard a woman scream.

Mildred Williams (Ms. Williams), a tenant in the apartment building, had gone downstairs and yelled at defendant and the victim to stop. Defendant then snatched the victim's jacket and ran out of the door. The victim spat defendant's ejaculation onto the floor, ran over to Ms. Williams, and began to hug her. Crying, the victim told Ms. Williams that she had been raped.

Ms. Williams had the victim sit on the steps inside another door entrance while a neighbor called the police. When the police arrived, the victim told them that the name of the man who raped her was Ralph. She also gave the police the following description of defendant: dark brown-skinned male, a little taller than herself, 30 to 35 years old, 130 to 135 pounds, with a facial scar.

A police officer took the victim to the hospital and interviewed her. She was later examined by a physician and released. Later that day, another police officer went to her home to show her a photo array. The victim selected defendant's photograph as the man who raped her.

Two days after being raped, the victim went to the police station, viewed a lineup consisting of five men, and chose defendant. The victim also told police that defendant was not wearing the glasses which he had worn when he raped her.

Ms. Williams viewed a lineup but was unable to identify the man

whom she had seen in the vestibule. However, she did report to the police that the man she had seen in the vestibule was wearing glasses and that she had seen him put something in his waistband.

Christine Anderson (Ms. Anderson or serologist), Chicago police department criminologist and expert serologist, testified that she conducted tests on the blood samples which the victim and defendant had submitted to the Chicago police department. She determined that the victim was a secretor and that defendant was a nonsecretor. In secretors, blood types can be determined from other bodily fluids such as semen and saliva. Ms. Anderson testified that she found the presence of B and O activity on the semen/saliva swab recovered from the crime scene. She further testified that this B and O activity was consistent with defendant's semen or sperm.

Three of defendant's co-workers testified for the defense as alibi witnesses. Emanuel Frank (Mr. Frank), a paralegal at E. Duke Mc-Neil & Associates, where defendant was also employed, testified the he opened the office every morning at 7 a.m. He further testified that on January 24, 1989, defendant arrived at the office at approximately 7:25 a.m., and left between 10 and 10:30 a.m. Mr. Frank admitted that although he learned that defendant had been arrested for a robbery and rape that had occurred around 8 a.m. on January 24, 1989, he never told the police or the State's Attorney's office that defendant had been at work at that time.

Earnest Duke McNeil (Mr. McNeil) testified that defendant was working part-time at his office and that when Mr. McNeil arrived at the office between 7:55 and 8 a.m. on January 24, 1989, that defendant was already there. However, Mr. McNeil admitted on cross-examination that, within days of the crime, he told an assistant State's Attorney that he had arrived at work on January 24, 1989, between 8:20 and 8:25 a.m.

Deborah Reasno (Ms. Reasno) testified that she had been the office manager for E. Duke McNeil for 10 years. She further testified that on January 24, 1989, she arrived at work between 8:15 and 8:30 a.m., and that defendant was already there.

All three of the alibi witnesses testified that there was no sign-in sheet or time clock to document what time defendant arrived at the office on January 24, 1989. All three witnesses denied being aware or remembering that defendant had a facial scar.

OPINION

I

Defendant first contends that the trial court's *voir dire* examina-

tion was insufficient, thus precluding him from receiving a fair and impartial trial. We agree.

Supreme Court Rule 234, *voir dire* examination of jurors, provides:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions." 87 Ill. 2d R. 234.

The purpose of *voir dire* examination is to filter out prospective jurors who are unable or unwilling to be impartial. (*People v. Jackson* (1977), 69 Ill. 2d 252, 260, 371 N.E.2d 602; *People v. Johnson* (1991), 215 Ill. App. 3d 713, 723-24, 575 N.E.2d 1247.) No precise technical test or formula exists for determining whether a prospective juror will possess the appropriate degree of impartiality. *People v. Pope* (1985), 138 Ill. App. 3d 726, 736, 486 N.E.2d 350.

The determination of whether or not a prospective juror is impartial rests within the sound discretion of the trial court and will only be set aside if it is contrary to the manifest weight of the evidence. *Johnson*, 215 Ill. App. 3d at 724.

Further, limitation of *voir dire* questioning may constitute reversible error if it results in denying a party a fair opportunity to properly investigate an important area of potential bias and/or prejudice among prospective jurors. (*Gasiorowski v. Homer* (1977), 47 Ill. App. 3d 989, 991, 365 N.E.2d 43.) And, a trial court

> " 'must exercise *** [their] discretion so as not to block the reasonable exploration of germane factors that might expose a basis for challenge, whether for cause or peremptory.' " *Fietzer v. Ford Motor Co* (7th Cir. 1980), 622 F.2d 281, 285, quoting *United States v. Lewin* (7th Cir. 1972), 467 F.2d 1132, 1138.

Thus, the examination must adequately

> "call to the attention of the veniremen those important matters that might lead them to recognize or to display their disqualifying attributes." *Lewin,* 467 F.2d at 1138.

We note that the appellate court, in *Johnson*, reversed and remanded the defendant's case because, *inter alia*, the trial court's determination with respect to challenges against three jurors was against the manifest weight of the evidence. Defense counsel challenged the three jurors who equivocated when asked by the trial court whether they could be fair and impartial. They had testified

that they had been victims of crimes, that their family members had been victims of crimes or that their friends had been victims of crimes, some of which were violent crimes. They were not filtered out as they should have been, especially since they could not convey that they would remain impartial. See *Johnson*, 215 Ill. App. 3d at 724-25.

Trial courts must not abuse their discretion. Here, there was such an abuse. Defense counsel tendered the following proposed *voir dire* questions to the trial court:

"1. Have you or any members of your family or a close friend been the victim of a crime? (If yes: Who was the victim? What was the crime? Was anyone ever arrested?)

2. Do you have any family members or close friends who are attorneys? Police officers?

3. Do you agree that an accused has the right not to testify at his trial and that if he does not testify it should not be held against him in any way?

4. What newspapers or magazines do you read regularly?

5. Do you agree with the proposition that a man is innocent until and unless it has been proven beyond a reasonable doubt that he is guilty?

6. At the close of the case I will instruct you as to the law—do you believe that you can apply the law as instructed even if you personally disagree with the law?"

The trial court stated that it would use, in some form, all except the question regarding the prospective jurors' preference for newspapers and magazines. The trial court also stated that its jury

"selection process works roughly in this fashion. I will interview the first six persons who sit immediately before me in the left side of the jury box or my right-hand side. Once I finish interviewing those six persons, the attorneys will have a brief opportunity to review those cards and make the appropriate selections."

In the present case, the trial court asked the entire panel of venirepersons the following:

"Have you or anyone in your family ever been the victim of the crimes of armed robbery, rape or sexual assault? If so, please rise. And also I should include, if you have had a close friend or a relative who has been the victim of a homicide.

There are a number of people who have stood up in response to that question. To those of you who are standing, is there anything about your prior experiences with the criminal justice system, either as a personal victim of the crimes that I just named, or knowing or being related to people who have experienced as a victim those crimes, that would prevent you from being fair and impartial? All right. The gentleman."

Out of approximately 15 to 20 who stood up, the trial court excused one prospective juror, Mr. Lebedon. While the trial court's procedure was to ask about the specific crimes involved in this case, the trial court abused its discretion. It merely asked questions but did not permit the jurors to respond individually. Nor was defense counsel afforded the opportunity to make a determination as to whether jurors were biased or impartial.

Outside the presence of the prospective jurors, the trial court stated the following to Mr. Crooks, defense counsel:

> "[W]ith respect to what you mentioned earlier, Mr. Crooks, about wanting to know the specific individual juror's experience with the criminal justice system, I didn't do that figuring that since all of them who said that they or someone they knew were the victim of a sexual assault or armed robbery indicated that notwithstanding that they would be fair and impartial jurors. Further inquiry along those lines as to any specifics would be unnecessary. Certainly I don't want to embarrass or make any prospective juror feel uncomfortable by requiring them [sic] to rehash what probably was at least a vicarious unpleasant experience. So for that reason, I neglected to ask the specific prospective jurors those questions.
>
> Furthermore, on the same lines I generally ask if any of the jurors have [sic] either been an accused, complaining witness or witness in the criminal justice system. I didn't do that this time. Also in the interest of avoiding embarrassing a prospective juror, I figured that the lawyers had access to the jury lists to see if any of the prospective jurors may have been convicted of anything in the past."

Mr. Crooks, defense counsel, objected by responding in the following manner:

> "Simply that the court ask questions regarding prior contact with the criminal justice system as a victim or family member who is a victim, et cetera, of serious offenses. That question was asked of the entire jury venire as they were out in the courtroom. Those people stood up. They did indeed say this wouldn't affect their handling of the jury service in this case, but in fact it *did not provide me with an opportunity to know which jurors had been either victims of or involved in serious crimes, that in fact we may have a juror sitting on this jury who for example has been the victim of a rape. And I feel I need that information at least for use of peremptory challenges if indeed they were in fact not suitable for challenges for cause.* And that is the basis for my objection."
> (Emphasis added.)

We agree with defense counsel because, as stated in *Lewin*:

"Prejudice and bias are deep running streams more often than not concealed by the calm surface stemming from an awareness of societal distaste for their existence. Extended and trial-delaying interrogation may not pierce the veil, yet a few specific associational questions as a maieutic process may indicate the dormant seeds of prejudice, preconceived and unalterable concepts or other nonfairness disqualifications. The result may not reach the stage of being a basis for cause challenge but could well, because of an abundance of counsel caution, bring about a peremptory challenge which an omniscient eye would have known should have been exercised.

\* \* \*

At some happy mesne point, there must be permitted sufficient questioning to produce, in the light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." *Lewin,* 467 F.2d at 1137.

In the present case, defense counsel exercised all seven of his peremptory challenges. If we were to include the excused prospective juror, Mr. Lebedon, 7 to 12 individuals would have remained standing. We do not know whether these individuals sat as jurors and whether they could be impartial. If, as the judge stated, he wanted to prevent any prospective venireperson from embarrassment, he could have conducted an *in camera* interview.

●1 Instead, the prospective jurors were never individually examined during the *voir dire* process. Nor was the trial court, State's Attorney, or defense counsel afforded adequate opportunity to ascertain whether the venirepersons were biased, victims of crime, or both. The question as propounded by the trial court was compound, confusing, unduly restrictive, and made it impossible to determine whether defendant received a fair and impartial jury. Trial courts have an interest in the selection of jurors in a manner so as not to compromise the jury selection process. Such is not the case here. The conduct of jury selection proceedings in this case did not ensure that defendant would be afforded his constitutional right to a trial before an impartial jury.

Section 8 of article I of the Illinois Constitution provides:

"In criminal prosecutions, the accused shall have the right to \*\*\* a speedy public trial by an *impartial* jury of the county in which the offense is alleged to have been committed." (Emphasis added.) Ill. Const. 1970, art. I, § 8.

An accused is entitled to be tried by jurors who do not have biases or prejudices which would prevent them from returning a verdict according to the law and evidence. (*People v. Lobb* (1959), 17 Ill. 2d

287, 300, 161 N.E.2d 325.) Thus, suitable inquiry is permissible in order to ascertain whether a juror has any bias, prejudice, or opinion which would obfuscate his ability to make a fair determination of the issues before the court. (*Lobb*, 17 Ill. 2d at 300.) The scope and extent of *voir dire* examination rests with the trial court's discretion. (*Lobb*, 17 Ill. 2d at 300.) However, trial courts must not abuse this discretion.

In the present case, the trial court abused its discretion because its jury selection procedure did not ensure a fair and impartial jury. Accordingly, we reverse and remand for a new trial.

Because we reverse and remand the case for a new trial, we believe it appropriate to consider other issues raised by defendant relating to matters which may arise on retrial.

## II

Defendant next claims that the prosecution did not prove him guilty of aggravated criminal sexual assault and armed robbery beyond a reasonable doubt. We disagree.

On review, a criminal conviction will not be set aside on the grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Tye* (1990), 141 Ill. 2d 1, 13, 565 N.E.2d 931.) And, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence all lie within the jury's province. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837.) Moreover, sufficiency of identification evidence is a question of fact. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355.) Thus, the relevant inquiry in determining whether a defendant was proven guilty of an offense beyond a reasonable doubt is:

> "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

See also *People v. Tye* (1990), 141 Ill. 2d 1, 14, 565 N.E.2d 931, 937; *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.

Because the fact finder's role as weigher of the evidence is preserved, it is not the function of the reviewing courts to retry defendant, and a "criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

Defendant believed that his alibi witnesses cast adequate doubt

upon the victim's identification of him. However, reasonable doubt is not created merely because there exists alibi evidence. (*People v. Menendez* (1980), 84 Ill. App. 3d 1140, 1142, 406 N.E.2d 127.) Nor are juries obligated to believe alibi evidence offered by the accused. *People v. Ault* (1963), 28 Ill. 2d 34, 35-36, 190 N.E.2d 815; *Menendez*, 84 Ill. App. 3d at 1142.

Rather, positive identification of a defendant, if by a credible witness, may be sufficient to sustain a guilty verdict even if the defense presents alibi witnesses. *People v. Trass* (1985), 136 Ill. App. 3d 455, 462, 483 N.E.2d 567; *Menendez*, 84 Ill. App. 3d at 1142.

●2 Defendant also alleges that the victim's trial and initial descriptions of defendant were inconsistent. However, the evidence supports the jury's verdict. The evidence indicates that immediately following the rape, the victim described defendant to the police and identified him by the name of Ralph. She said that the perpetrator had a dark complexion, was a little taller than herself, and was approximately 30 to 35 years old. In fact, defendant was of a dark hue, was approximately 37 years old, was of a slight build, had a scar on the right side of his face, wore glasses, and was slightly taller than the victim when she wore high heels.

Defendant also asserts that the victim's failure to consistently report that she had met defendant on numerous prior occasions eradicates her credibility. This argument is not convincing because Officer Ronald Wilkerson (Officer Wilkerson) testified that the victim not only gave a physical description of defendant but gave the officer the name "Ralph" as well.

Nor was she obligated to tell a medical examiner, while at the hospital emergency room, that she knew the identity of the man who had raped her, as defendant asserts. A medical examiner is not a police officer. And, it was to a police officer that the victim gave defendant's description. The examination which the victim received by the doctor was for medical purposes only. She had already been interviewed by the police.

## III

Defendant next posits that the victim's pretrial identification of him from a lineup and her subsequent in-court identification should not have been admitted at trial. We disagree.

Specifically, defendant claims that the lineup obscured the height of the participants because the victim viewed them sitting down and, as such, precluded her from observing that defendant was taller than she reported to the police.

The linchpin in determining the admissibility of identification ev-

idence is reliability. (*People v. Brewer* (1983), 118 Ill. App. 3d 189, 197, 454 N.E.2d 1023.) And, five factors are to be used in assessing the reliability of an allegedly suggestive lineup identification (*Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382):

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

•3 Defendant's argument lacks merit because the victim had adequate opportunity to view defendant as he forced her, at gunpoint, to walk to the apartment vestibule where she was raped and sexually assaulted. Moreover, her degree of attention enabled her to notice a scar that was on the right side of his face. She accurately described defendant: dark complexion, eyeglass-wearing, facial scar. The witness further identified defendant in a photo array, at a physical lineup at the police station, and at trial. She also, immediately after being raped, told a police officer that her rapist was named Ralph, a name by which defendant was also known. Further, the fact that the police conducted the lineup with the participants sitting down reduced, rather than enhanced, the likelihood of misidentification.

The State also maintains that defendant waived his contention that the in-court identification was improper. However, assuming *arguendo* that defendant did not waive this issue, we find that there was nothing improper with the victim's in-court identification of defendant.

## IV

Plaintiff next asserts that the admission of semen/saliva test results constituted reversible error. We disagree.

The State contends that defendant has waived this issue by failing to object and by failing to raise this question in a post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Arguably, defendant has waived this issue. However, we will consider this matter.

Evidence which has some relevance and fairly tends to prove the offense charged is admissible. (*People v. Uzelac* (1988), 179 Ill. App. 3d 395, 407, 534 N.E.2d 1250.) And, to be relevant, evidence need only tend to prove or disprove a disputed fact or it must render the matter at issue more or less probable. *Uzelac*, 179 Ill. App. 3d at 407.

The court held in *Uzelac* that the admission of fluid-typing test results was proper. The results of that test found that the sample found represented a group of approximately 80% of the population.

In the present case, the serologist stated that the semen/saliva sample found represented 20% of the population. Defendant tested as being a nonsecretor, which means that his blood type would not be reflected in his semen. The victim was a secretor.

The serologist further testified that there was B and O activity that was consistent with defendant's semen and the victim's saliva, and thus, he could not be excluded as the donor of the sperm sample.

Moreover, this evidence, as was the case in *Uzelac*, was used to corroborate the eyewitness testimony given by the victim. Defendant cites *People v. Schulz* (1987), 154 Ill. App. 3d 358, 506 N.E.2d 1343, and *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303, as reasons that this court should reverse his case. However, both cases are distinguishable for the following reasons.

The *Schulz* court found that admissions of blood and fluid test results constituted reversible error because testing failed to exclude the accused from 20% of the population's possible secreting enzyme donors. The court stated that the absence of corroborating evidence rendered such results inadmissible. *Schulz* is further inapposite to the present case because the test results, there, were a major portion of the evidence against the defendant since there were no eyewitnesses. *Schulz*, 154 Ill. App. 3d at 365.

The *Schulz* court also distinguished cases where similar types of test results had been admitted based on the fact that, in those cases, such results corroborated guilty findings. This court stressed that the absence of other corroborating factors that would have served to confine/narrow the possible group of offenders rendered the information inadmissible. *Schulz*, 154 Ill. App. 3d at 365.

Nor is this case analogous to *Linscott*, an appeal from a *murder* retrial where the issue was not founded upon the admissibility of the fluid-typing tests but rather the prosecutor's misstatements of those test results to the jury. Though the issue was not directly applicable, the *Linscott* court stated that inconclusive evidence of the semen taken from the murdered victim and defendant was irrelevant because it only demonstrated that the defendant was a member of a large group of persons who could have been the semen's donors. (*Linscott*, 159 Ill. App. 3d at 76.) We emphasize that the defendant in *Linscott* was not being retried on the rape charge, thus rendering irrelevant the issue of test results.

●4 Here, defendant was charged and subsequently found guilty of aggravated criminal sexual assault and armed robbery. The admission of semen/saliva test results was relevant and admissible because they corroborated the victim's eyewitness testimony. The evidence serologist's testimony could have been interpreted by the jury in either way. We cannot usurp the jury's function.

## V

Defendant finally asserts that the cumulative effect of erroneous evidentiary rulings deprived him of a fair trial. We disagree.

Specifically, defendant asserts that the trial court's admission of a statement that defendant's mother, who did not testify at trial, made constituted reversible hearsay. Defendant also contends that the admission of a flash-enhanced photograph of the vestibule also constituted reversible error.

A defendant cannot assert that the cumulative effect of alleged errors deprived him of a fair trial if he has failed to demonstrate "anything approaching reversible error" in his argument to justify a new trial. (*People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206.) With the exception of the *voir dire* issue, the cumulative effect of the errors that defendant cites above did not constitute reversible error.

If evidence is admitted to demonstrate the course of an investigation, and surrounding circumstances, it is not hearsay and is admissible. (*Menendez*, 84 Ill. App. 3d at 1142.) In *Menendez*, the court stated that an alleged improper admission of hearsay evidence would be held, even if improperly admitted, not to constitute reversible error where the verdict was sufficiently established by otherwise proper evidence. The same applies to the instant case.

•5 A police officer went to defendant's residence, located at 6321 South Langley. Defendant's mother told the police officer that defendant did not stay there but visited periodically. The officer testified to this at trial, and defense counsel objected. The court replied that the statement was "not hearsay. It's not being offered for the truth of the matter asserted." We agree with the trial court. Such information was not hearsay but was used to explain circumstances revolving around defendant's arrest.

Defendant contends that the admission of this statement tended to negate his alibi defense. We disagree because we do not see any correlation between the mother's statement as elicited through the police officer and defendant's alibi defense.

As for the admission of the flash-enhanced photograph of the vestibule, defendant asserts that such emphasis improperly magnified the credibility of the victims's identification of defendant. We disagree.

The admission of photographs is a matter within the trial court's discretion whose determination may not be overturned absent an abuse of its discretion prejudicial to the defendant. *People v. Rolon* (1979), 71 Ill. App. 3d 746, 750-51, 390 N.E.2d 107.

As a general rule, photographs should be excluded when they

would confuse or mislead the jury. (*Rolon*, 71 Ill. App. 3d at 752.) They should not be admitted into evidence unless they are shown to portray certain facts relevant to an issue of the case and are verified as a correct representation of those facts. (*Rolon*, 71 Ill. App. 3d at 751-52.) However, in the instant case, the photographs were not confusing. They were relevant. *Rolon* is inapposite.

For the reasons previously stated, we reverse and remand for a new trial.

Reversed and remanded for a new trial.

MURRAY, P.J., and GORDON, J., concur.