THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENT KILLINGSWORTH, Defendant-Appellant.

First District (3rd Division)   No. 1—98—3532

Opinion filed June 21, 2000.

Michael J. Shim and Marshall Weinberg, both of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jon J. Walters, and Daniel J. Kollias, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

This was a senseless shooting—with no apparent motive or reason—which resulted in the death of 16-year-old Michael Thomas.

Defendant Kent Killingsworth (Killingsworth) was charged with the October 10, 1996, murder of Thomas. After a bench trial, he was found guilty of first degree murder and aggravated discharge of a firearm. A sentence of 40 years' imprisonment was imposed for the murder conviction and a concurrent term of 15 years' imprisonment was imposed for the aggravated discharge of a firearm conviction.

Killingsworth contends the witness testimony presented at trial, in light of his alibi evidence, failed to establish beyond a reasonable doubt his identity as the shooter. We are also asked to consider whether the trial court abused its discretion when it imposed the 40-year sentence for the murder conviction.

We affirm the two convictions and the sentence for murder.

## FACTS

It was stipulated at trial Thomas died as a result of multiple gunshot wounds. One shot entered the left side of Thomas' head, one entered the left shoulder, and two entered the left side of Thomas' upper back. It was further stipulated the four bullets recovered from Thomas' body appeared to come from the same weapon—a 9 millimeter gun. No gun was recovered.

The State presented the testimony of two eyewitnesses. The first eyewitness was Ricky Brown, who had been a friend of the victim, Michael Thomas (known as Mickey), for several years, having grown up in the same neighborhood. Brown, like Mickey, was 16 years old on October 10, 1996.

On that date, between 2 and 3 p.m., Brown saw Mickey at the corner of 66th and Campbell. Another friend, William Ephraim (also known as Pea-Dog), drove up to the corner in a two-door, white Grand Prix. Brown, Mickey, and another friend, Shanard Lesure (Lesure), got into the car. They rode to a car lot at 56th and Western. Ephraim drove, Brown was in the front passenger seat, Mickey sat behind Ephraim, and Lesure sat behind Brown.

After a short while the four friends drove back toward 66th Street, traveling south on Campbell. At about 63rd Street, Ephraim pulled over to the curb to talk to some people. Since Campbell is a one-way street, Ephraim pulled up to the curb on the driver's side.

Initially, two young men, whom Brown identified as "Marlon" and "Head," were talking to Ephraim and Mickey. Then the two men called over a third person, named "Kiki." Though Brown testified he had never spoken to Kiki before that day, Brown said he had seen Kiki in the neighborhood over the past several months and recognized him as someone who went by the name "Kiki." In court, Brown identified Killingsworth as Kiki.

Brown testified defendant approached the car from the rear driver's side. As soon as defendant came up to the car, Brown heard gunshots. Brown said he didn't see defendant fire the gun because he turned his head toward the front of the car just as defendant arrived. Brown did testify, however, he looked back after the shots as Ephraim was pulling away from the curb to rush Mickey to the hospital. Brown said he saw defendant with a gun in his hand, running away from the car. Brown said defendant was the only person he saw holding a gun.

After the shooting, Ephraim drove to Holy Cross Hospital. Mickey was wheeled inside and Lesure stayed with him. Brown and Ephraim left the hospital, and Brown went to Mickey's house to report the shooting. Brown said he spoke to Mickey's sister, Michele, and told her what happened.

Later that night, when Brown was walking in the area of 66th and Campbell, the police drove up. They had Michele in the car and she pointed him out to the police. Brown then accompanied the police to the station, where he gave them a statement about the shooting incident.

When Brown first spoke with the police on the evening of October 10, 1996, he told them Kiki shot into the car where Mickey was sitting and he identified defendant from a photographic array. Brown also told police the incident occurred when he was driving with his girlfriend in a car other than the white Grand Prix. Later, on October 22, 1996, Brown spoke to the police a second time. This time he admitted the incident occurred when he was riding in a white Grand Prix. He explained that earlier he told police he had been in a different car because he thought the police might seize the car that was involved in the incident. The white Grand Prix belonged to Ephraim's sister and he didn't want Ephraim to get in trouble.

During this second encounter with the police, Brown met with Assistant State's Attorney Wasilewski and gave a written statement. In that written statement, Brown said he "looked over and saw Kiki standing right there on the curb by the back of their car on the driver's side, and Kiki was holding a gun."

The second eyewitness to testify was Lesure. His testimony corroborated Brown's account. Lesure said he met up with Mickey at the corner of 66th and Campbell after he got out of school at 2:30 p.m. and they both got into the back of a white car driven by Pea-Dog. Ricky Brown was in the front passenger seat.

After driving to a restaurant near 57th and Western, they headed back, traveling south on Campbell. It was about 3:45 p.m., Lesure said, when they stopped near 63rd and Campbell so Ephraim could talk to a couple of people he saw on the sidewalk. They pulled over to

the curb and sat in the car while Ephraim and Mickey spoke to the two young men, who were standing on the sidewalk on the driver's side of the car. A third person, whom Lesure called "Kiki" and identified in court as defendant, approached the car from the rear on the driver's side. Lesure testified that as defendant approached the car he "saw lights" and heard gunshots coming from the driver's side, where Kiki was.

Although, in court, Lesure testified he immediately ducked down and didn't actually see defendant shoot, he admitted he told the grand jury he "saw Kiki walk up and start shooting."

The window at the rear of the driver's side was shot out and Mickey was bleeding. Ephraim started to drive away so fast the tires spun. They immediately drove to the Holy Cross Hospital emergency room. Lesure went into the emergency room and got a wheelchair so they could get Mickey inside. Lesure said he stayed at the hospital for about 20 minutes, then left the hospital and went to Mickey's house to tell what happened.

Lesure did not go to the police to report the incident. Lesure first spoke with the police on October 22, 1996, after the police came to his school and took him to the police station. Lesure testified he told police Kiki had been the shooter and he identified defendant as Kiki from a photograph they showed him. Lesure also signed a written statement after speaking with an assistant State's Attorney.

Troy Bennet, a security officer at Holy Cross Hospital, testified he had been on duty at the emergency room on October 10, 1996. That afternoon, he saw a white car with four young men pull up in front of the emergency room doors. The rear window on the driver's side was shattered. The young men were screaming for help because one of them had been shot. He helped wheel out a cart and assisted getting the young man out of the car and into the emergency room. When he came back outside, the car was gone.

Albert Graf and William Moser, the two Chicago detectives assigned to the Thomas murder investigation, testified. They said they went to defendant's home on the evening of October 10 but were unable to locate him. Killingsworth's mother told them she didn't know where Killingsworth was.

The detectives told Mrs. Killingsworth they were looking for her son and left a card with her, asking her to contact them when she saw him. After October 22, 1996, an arrest warrant was issued for Killingsworth and his photo was distributed to several local police stations. The detectives made repeated visits to his home but were unable to locate him.

On February 25, 1997, Killingsworth came to the police station,

accompanied by his mother and a lawyer, to turn himself in. He gave no statement regarding the shooting incident.

At trial, Killingsworth's mother and niece, Kimwana, testified. Mrs. Killingsworth admitted her son went by the nickname "Kiki," a name given to him by his father at birth, and he had a tatoo with that name. However, she and Kimwana both testified Killingsworth had gone with them to the Daley Center in downtown Chicago on October 10, 1996, and did not return home until about 4:10 p.m. Documents bearing a date stamp of October 10, 1996, were entered into evidence.

## DECISION

Killingsworth's primary challenge is to the sufficiency of the evidence. He contends the two eyewitnesses who identified him were not credible and their testimony did not overcome his alibi evidence. Consequently, Killingsworth says, the evidence failed to establish beyond a reasonable doubt his complicity as the shooter. We disagree.

The standard of review when there is a challenge to the sufficiency of the evidence is whether, after viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). Reasonable doubt is not created merely because alibi evidence exists, nor is the trier of fact obligated to believe alibi evidence offered by the accused. *People v. Oliver*, 265 Ill. App. 3d 543, 637 N.E.2d 1173 (1994).

■ Even a single positive identification by a witness who had ample opportunity for observation is sufficient to support a conviction. *People v. Johnson*, 114 Ill. 2d 170, 189, 499 N.E.2d 1355 (1986). In assessing identification testimony, the circumstances to be considered include: the opportunity of the witness to view defendant at the time of the crime; the witness' degree of attention; the accuracy of any prior description of defendant; the level of certainty demonstrated by the witness at an identification confrontation; and the length of time between the crime and an identification confrontation. *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317 (1989). The sufficiency of identification evidence is a question for the trier of fact, and a reviewing court will not set aside a conviction unless the evidence is so unsatisfactory as to raise a reasonable doubt as to defendant's guilt. *Johnson*, 114 Ill. 2d at 190.

■ In this case, the two eyewitnesses were not shining examples of good citizenship. At the time of trial, Brown was on probation for a drug conviction. He had prior juvenile convictions for possession of drugs, possession of a stolen motor vehicle, and unlawful use of a weapon. Lesure, at the time of trial, was in custody on a pending murder charge.

But, criminal records notwithstanding, the trial court found the identification of Killingsworth by both Brown and Lesure to be credible and found the alibi evidence to be incredible. We see no manifest error which would allow us to reverse that decision.

Brown spoke with police within hours of the occurrence. Although Brown initially gave police some misinformation about the vehicle they had been in when the shooting occurred, he explained the reason for that deception. Brown never wavered, however, in his identification of the shooter. From the beginning he told the police the shooter was someone known as "Kiki" and identified defendant from his picture in a photo array. Although Lesure didn't speak with police until October 22, 1996, he, too, identified "Kiki" as the shooter and identified defendant's picture. Defendant, it was shown, went by the nickname "Kiki" and had that name tattooed on his body.

Both Brown and Lesure had been in the car at the time Thomas was shot and had sufficient opportunity to see the shooter. Both Brown and Lesure testified they saw defendant approach the car. Immediately thereafter they heard gunshots. Although both witnesses were reluctant to say at trial they saw defendant shoot the gun, Brown testified he saw defendant holding a gun immediately after the shooting. Brown also said defendant was the only person he saw holding a gun that day. That testimony was unimpeached.

The physical evidence corroborated the testimony of Brown and Lesure. When a white car pulled up to the emergency room doors at Holy Cross Hospital, the security guard noticed the left driver's window had been shattered. The medical examiner's report showed that Thomas died from multiple gunshot wounds that entered the left side of his head, shoulder, and back. This physical evidence corresponded to the witness testimony regarding Thomas' positioning in the car when he was shot.

The security guard also testified he saw four young men, including Thomas, in the car. This corroborated the testimony of Brown and Lesure.

Finally, the trial judge could have interpreted the defendant's behavior immediately after the incident as flight from the law. Killingsworth remained away from his home for more than four months and could not be located by police until he turned himself in, accompanied by a lawyer. The trier of fact is allowed to infer from such behavior a consciousness of guilt. *People v. McDonald*, 168 Ill. 2d 420, 448, 660 N.E.2d 832 (1995).

The alibi, too, was suspect since there was no evidence Mrs. Killingsworth or her granddaughter ever attempted to tell police about this alibi in the four months the police were searching for Killings-

worth. Similarly, the documents presented by the defense did little to bolster the alibi. Though the documents had an October 10, 1996, date stamp, there was no indication of the time these documents were received, nor did the date stamp indicate who was present when the documents were stamped. Simply stated, the documents provide no definitive evidence of defendant's whereabouts on October 10, 1996.

For all these reasons, we find the trial court's judgment adequately supported by the record. We find no error in the trial court's rejection of the alibi evidence. The witness testimony presented at trial was sufficient to overcome the alibi defense and prove Killingsworth's identity as the shooter beyond a reasonable doubt. Defendant's convictions for murder and aggravated discharge of a firearm are affirmed.

■ The remaining issue concerns the sentence imposed. Killingsworth contends the trial court abused its discretion by imposing a 40-year term of imprisonment for the murder conviction when the record showed defendant was young, had a potential for rehabilitation, and had no prior convictions for violent crimes.

In *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997), our supreme court decided the 1993 amendment to section 5—8—1(c) of the Unified Code of Corrections (730 ILCS 5/5—8—1(c) (West 1994)) requires that a defendant file a written postsentencing motion in the trial court to preserve sentencing issues for appellate review. Being mandatory, the failure to file such a motion results in forfeiture of the issue, unless the error or defect amounts to plain error. *Reed*, 177 Ill. 2d at 395. Only when a defendant alleges the existence of plain error affecting substantial rights may the defect be brought to the attention of the reviewing court without having been raised in the trial court. See 134 Ill. 2d R. 615(a); *People v. Kyles*, 303 Ill. App. 3d 338, 708 N.E.2d 391 (1998).

In this case, Killingsworth did not file the necessary postsentencing motion with the trial court. Furthermore, the sentencing defect he claims—the trial court's failure to give appropriate weight to certain mitigating factors—does not amount to plain error. Under these circumstances, the forfeiture rule applies and we find no basis for reviewing defendant's sentence.

We affirm Killingsworth's convictions for murder and aggravated discharge of a firearm and the sentences imposed.

Affirmed.

CERDA and BURKE, JJ., concur.