THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD OLIVER, Defendant-Appellant.

First District (2nd Division) No. 1—97—1889

Opinion filed June 22, 1999.

Timothy E. Kapshandy and Darin V. Osmond, both of Sidley & Austin, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court.

In 1997, a jury convicted the defendant of armed robbery and aggravated criminal sexual assault. The trial court sentenced him to consecutive terms of imprisonment for 30 and 60 years in the Illinois Department of Corrections.

The defendant appeals these convictions, arguing that: (1) the trial court erroneously permitted the prosecution to introduce experimental scientific evidence; (2) the prosecution misstated the results of DNA testing in closing argument; (3) the prosecution shifted the

burden of proof to the defendant in questioning his expert witness as to why he had not conducted his own serology testing; (4) the probability figures based on the DNA tests should not have been admitted because they were substantially more prejudicial than probative; (5) the trial court should not have qualified a prosecution witness as an expert in population genetics; (6) the trial court erred in refusing to question the venire specifically on racial prejudice; (7) the trial court erroneously admitted evidence that revealed that the defendant had prior convictions; (8) the trial court erroneously denied a motion to exclude any reference to the victim's family; (9) the trial court erred in refusing to allow the defense to introduce demonstrative evidence; and (10) the defendant was not proved guilty beyond a reasonable doubt.

BACKGROUND

This is the second time that this case appears before this court. We overturned the defendant's initial conviction due to errors in *voir dire*. See *People v. Oliver*, 265 Ill. App. 3d 543, 637 N.E.2d 1173 (1994) (*Oliver I*).

On the morning of January 24, 1989, S.S. was on her way to the bus stop when she was forced at gunpoint into the vestibule of a nearby apartment building and raped. S.S. testified at trial that she was on her way to attend computer classes. The defendant grabbed her from behind and put a gun to her neck. She saw the defendant had grey glasses and a scar on the right side of his face. She recognized him as a man to whom she had been introduced several years before. She had been told that his name was "Ralph."

The defendant ordered S.S. to remove her shoes and told her to walk. He warned her not to look at him, but she did. They stopped at a three-story apartment building. The defendant kicked open the outer door and forced S.S. into the entryway. He had her put down her purse, bookbag and shoes and then walk around. He then made her take off her jacket and pull up her sweater. He tried to cover her face with the jacket in order to keep her from seeing him. However, the jacket repeatedly fell off S.S.'s head during the course of the assault. The defendant had intercourse with S.S. and then forced her to perform fellatio. He ejaculated in her mouth and she spit out the semen.

Mildred Williams, a first-floor resident of the building, testified that she was conversing with a neighbor when she heard noises coming from the entryway. She went to see what was happening and saw the defendant, whose back was to her, and S.S. Ms. Williams, thinking that they were engaging in a consensual sex act, yelled and screamed

"how dare they be in that lobby." The defendant turned around and glanced at Ms. Williams, and then he walked away. He made a motion as if he were putting something in his waistband.

S.S. relates that as the defendant left he took her leather jacket. She screamed that she had been raped and Ms. Williams went out to help her. Ms. Williams called to a neighbor to dial 911.

The police then arrived and took S.S. to a hospital. She gave them a description of her assailant. She said that he had a scar on his face, wore glasses and was no more than two inches taller than she was. She said his name was Ralph. The police took photos of the crime scene and recovered semen and saliva samples from the floor.

A detective went to speak to Sharon Allison, who had introduced S.S. to Ralph. Ms. Allison told her that the real name of the person she had introduced to S.S. as "Ralph" was "Harold Oliver." When she had introduced him, S.S. had said "I know you" because she had seen him several times at a YMCA social center. The police had mug shots of the defendant on file. The detective took the mug shots of the defendant as well as mug shots of several other African-American males in order to present S.S. with a photo array. S.S. picked the defendant's photo out of the array.

The photo array was admitted as evidence at the trial over defense objection. The trial court had the part of the photos with the Department of Corrections plaque cut off before the photos were shown to the jury.

Two days after the assault, the police brought in the defendant. They did not find the leather jacket or the gun at his residence. Police officers searched the defendant and found a pair of glasses in his pocket. The defendant's height was actually 5 feet 7 inches, much taller than S.S. had estimated. S.S. viewed a lineup with the defendant and identified him, but she said that he had been wearing glasses when he assaulted her. Ms. Williams was not able to pick the defendant out of the lineup.

The defendant was taken to the lockup. The police could not find the defendant's glasses. They looked everywhere the defendant had been in the station. Then, in a routine search of the defendant before he was placed in the lockup, police found the glasses hidden under the defendant's sweater in his armpit.

At trial the defendant presented an alibi defense. He worked at a law office a couple of miles from the crime scene. The office manager, Deborah Reasno, testified that the defendant had been at work when she arrived on the morning of January 24 between 8:15 and 8:30. She knew him as "Ralph." Assistant State's Attorney (ASA) Maureen Feerick testified that she had spoken to Ms. Reasno a few weeks after

the crime and taken notes of the conversation. Ms. Reasno, ASA Feerick testified, had said that she arrived at work at 8:30 that morning.

Emmanuel Frank, a paralegal at the same law office, was a witness at a prior trial but was not available at this proceeding. His prior testimony was read into the record. He had testified that the defendant had arrived about 7:15 on the morning of January 24, and that he had not left before 10 or 10:30. He recalled that Ms. Reasno had arrived at the office at 8:30.

Dr. Harold Deadman, a former supervisor of the DNA analysis unit of the Federal Bureau of Investigation (FBI), testified for the State as an expert in DNA profiling. Dr. Deadman testified that he performed three sets of tests on the samples from the crime scene. First he performed a "Restriction Fragment Length Polymorphism" (RFLP) test according to FBI protocol. From this test he obtained an unusual result—only one band appeared on the gel. Nevertheless, the result was sufficiently definite for him to determine that: (1) the DNA in the tested sample was not consistent with the victim's and thus probably came from the attacker; (2) the DNA was consistent with the defendant's; and (3) the probability of a random match among African-American males was 1 in 41.

About a year later, in response to criticism from a defense expert, Dr. Deadman repeated the test in order to verify and explain the unusual one-band result. He suspected that in the first test a band may have "run off the gel," so he modified the test so that the DNA would not travel as far. Instead of 17 hours, he ran the test for 15 hours. He exposed the DNA to an electric field of 25 volts rather than 30 volts, and he used more DNA than in the previous test. These test parameters varied slightly from the FBI protocol. From this second test he concluded that some bands had indeed run off the gel in the first test and that some larger bands may have degraded, and that this was why only one band had shown up. He did not perform a separate statistical analysis based on the second test.

In 1996, a new DNA profiling technique called "Polymerase Chain Reaction" (PCR) became available. Dr. Deadman then performed a PCR test on the semen sample. Once again there was a match. Based on the results of this test, he calculated that the chances of a random match among African-American males was 1 in 2,200.

At a *Frye* hearing prior to the trial, the defense objected to Dr. Deadman's testimony. The defense claimed that the modified RFLP test that Dr. Deadman had performed was an experimental procedure that did not have the requisite level of acceptance in the relevant scientific community to be admitted as evidence. The results of the first test were suspect, the defense contended, based on the unusual one-band result. The defense argued that even if the results were admis-

sible under *Frye*, they should be excluded as substantially more preju-, dicial than probative. Finally, the defense objected to the qualification of Dr. Deadman as an expert in population genetics, the field which allows one to calculate probabilities based on the results of a DNA test. Dr. Deadman was not qualified, the defense argued, because he had taken no courses in population genetics. The trial court allowed Dr. Deadman's testimony.

Christine Anderson, who used to work at the Chicago Police Crime Lab, testified for the State as an expert in serology. She performed tests on the physical evidence in this case. Her testing showed that the defendant had blood type O and that he was a nonsecretor, meaning that his blood type cannot be determined by examining bodily fluids other than blood. S.S. had blood type B. Since no other blood type was found in the samples, the assailant either was a nonsecretor or had the same blood type as S.S. This test ruled out about half of the African-American male population.

Defense experts questioned the results obtained by Dr. Deadman and Ms. Anderson. The trial court admitted over defense objection an evidence deposition in which one of the defense experts, Dr. Sassetti, was cross-examined concerning the fact that the defense had not conducted serology testing although samples were available.

The jury found the defendant guilty of aggravated criminal sexual assault and armed robbery. At the sentencing hearing, the State informed the court that the defendant had been convicted of sexual assault several times before and also of armed robbery. In mitigation, the defense presented evidence that the defendant had four children and had been employed. A minister testified as to his good character. The trial court sentenced the defendant to a term of 30 years' incarceration for the armed robbery and a term of 60 years for the sexual assault, to run consecutively.

The defendant appeals his convictions, arguing that: (1) the trial court erroneously permitted the prosecution to introduce experimental scientific evidence; (2) the prosecution misstated the results of DNA testing in closing argument; (3) the prosecution shifted the burden of proof to the defendant in questioning Dr. Sassetti as to why he had not conducted his own serology testing; (4) the probability figures based on the DNA tests should not have been admitted because they were substantially more prejudicial than probative; (5) the trial court should not have qualified Dr. Deadman as an expert in population genetics; (6) the trial court erred in refusing to question the venire specifically on racial prejudice; (7) the trial court erroneously admitted evidence that revealed that the defendant had prior convictions; (8) the trial court erroneously denied a motion to exclude any

reference to the victim's family; (9) the trial court erred in refusing to allow the defense to introduce demonstrative evidence; and (10) the defendant was not proved guilty beyond a reasonable doubt.

ANALYSIS

I

■ The defendant first contends that the trial court erroneously admitted experimental evidence that did not have widespread support in the scientific community. The determination of whether to admit expert testimony about a new scientific technique rests in the discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285 (1989). The standard in Illinois for determining whether a new scientific technique is admissible is that set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Eyler*, 133 Ill. 2d at 211, 549 N.E.2d at 285. According to *Frye*, the scientific principle or technique from which the expert testimony is deduced "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

■ In this case, the basis of Dr. Deadman's conclusions was RFLP testing. Forensic RFLP analysis (*People v. Hickey*, 178 Ill. 2d 256, 278, 687 N.E.2d 910, 921 (1997)) and PCR analysis (*People v. Pope*, 284 Ill. App. 3d 695, 672 N.E.2d 1321 (1996)) are generally accepted by the relevant scientific community. Thus, the evidence was admissible under *Frye*.

Contrary to the arguments of the defense, the minor variations that Dr. Deadman made in the parameters of the second RFLP test did not render it a new scientific technique for the purposes of *Frye*. It is true that not only the theory behind a test but also the general techniques and procedures used must satisfy *Frye*. *People v. Dalcollo*, 282 Ill. App. 3d 944, 956, 669 N.E.2d 373, 386 (1996). However, this does not mean that the specific procedures used in a particular case are subject to *Frye*. Any such questions went to the weight, and not the admissibility, of Dr. Deadman's testimony. *Dalcollo*, 282 Ill. App. 3d at 957, 669 N.E.2d at 386; *Hickey*, 178 Ill. 2d at 279, 687 N.E.2d at 921.

II

The defendant next argues that his convictions should be overturned on the basis of the prosecution's misstatement of DNA evidence in rebuttal argument.

The prosecution argued as follows:

"And the other DNA, 1 in 2200, and you can do the math. That's

less than five thousandths of one percent of the black population that possibly constructed that DNA. Those are pretty strong numbers, ladies and gentlemen."

In fact, 1 in 2,200 is approximately five one-hundredths of one percent. The prosecution admits that it made such a misstatement, but argues that the issue has been waived and that the incorrect statement was harmless.

■ The prosecution contends that the defendant has waived this issue since there was no contemporaneous objection and the issue was not included in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). While this is true, it would be somewhat unfair to penalize the defense for not making a contemporaneous objection, since defense counsel did not have time to check the calculations on the spot.

In *People v. Linscott*, 142 Ill. 2d 22, 566 N.E.2d 1355 (1991), the Illinois Supreme Court reversed an accused murderer's conviction because of misstatements made by the prosecution in closing concerning the physical evidence. *Linscott* concerned a rape and murder. The State's case against the defendant had three major parts. First, the defendant had come forward and told the police of a dream about the killing, which, prosecutors claimed, was very similar to how the killing actually happened. Second, head and pubic hairs consistent with the defendant's were found at the scene. Third, bodily fluids were recovered that were consistent with the defendant's, as he was a nonsecretor.

The prosecutor in *Linscott* made several misstatements in closing argument. First, he argued that the hairs found at the scene had been shown to be the defendant's, rather than that they had been shown to be *consistent* with the defendant's. Also, the prosecution had elicited testimony that if 40 particular tests were done on the hairs, the chances of a random match were 1 in 4,500 for the head hair and 1 in 800 for the pubic hair. In closing argument, the prosecutor suggested that these two figures could be multiplied, and that the chances of a random match of both kinds of hair was about 1 in 3 million. In fact, however, only 7 to 12 tests had been performed on the hairs, not 40. Thus, there was no basis for the probability numbers. Finally, the evidence showed that the murderer was either a nonsecretor or a secretor with blood type O. The prosecution argued simply that the tests showed that the murderer was a nonsecretor, like the defendant.

■ In the instant case we believe the error was harmless. Prosecutorial misconduct in closing argument merits reversal of a conviction if such misconduct constituted a material factor in the conviction. *Linscott*, 142 Ill. 2d at 27, 566 N.E.2d at 1358. In *Linscott*, the prosecutor

several times grossly overstated the hair evidence and the serological evidence. Furthermore, the *Linscott* court noted that the evidence in that case was closely balanced. Unlike the case at bar, there were no eyewitnesses. The only evidence aside from the hair and body fluids was the defendant's dream.

In the case at bar, elsewhere in argument the prosecution correctly said that the figure was 1 in 2,200. The probabilities were only misstated on one occasion. In *People v. Moore*, 171 Ill. 2d 74, 100, 662 N.E.2d 1215, 1226-27 (1996), the Illinois Supreme Court held that overstatement of the weight of physical evidence by a prosecutor in closing argument did not deprive defendant of a fair trial where the misstatement was isolated and elsewhere the weight of evidence was expressed correctly. Aside from the apparently inadvertent miscalculation of the percentage figure, in our view, the prosecution was quite careful not to overstate the physical evidence, as is seen in the following comments from closing argument and rebuttal, respectively.

"You heard about the DNA. You heard about serology. And it doesn't say that's him, it doesn't say that's the only person in the world. What does it say? Let's break the world down. Let's break the population into two groups; the groups—the group where it couldn't have been him, and the group where it could have been him. The only dispute you have then is numbers."

"By [itself] is [the DNA testing] enough? No. Nobody would ever tell you that. But it is corroboration."

Given the strength of the case against the defendant, in our view the misstatement was not a material factor in the convictions. See *People v. Sutherland*, 155 Ill. 2d 1, 11, 610 N.E.2d 1, 11-12 (1992). In this case there was an eyewitness identification corroborated by two types of DNA tests as well as serology evidence. Accordingly, the complained-of error did not deprive the defendant of a fair trial.

### III

The defendant next argues that the trial court erroneously permitted the prosecution effectively to shift the burden of proof to him in questioning his expert witnesses about the failure to perform independent forensic testing. The defense unsuccessfully moved *in limine* to prevent any reference to the failure of the defense to perform its own forensic testing. In particular it objected to an evidence deposition of Dr. Sassetti, one of the defense witnesses, which reads in pertinent part:

"Q. You yourself have done no testing in the lab on any part of this case?
A. No.

Q. You have not tested any samples on Harold Oliver?
A. No.
Q. You have not tested any sample from [S.S.]?
A. No.
Q. Are you requested to do any testing on any of the samples?
A. No.
Q. As far as you know, Harold Oliver is still alive, correct?
A. Yes.
Q. And he's perfectly capable of providing samples?
A. I don't know.
Q. He still has blood and saliva and is still alive?
A. Yes.
Q. And [S.S.] is still in existence?
A. I guess.
Q. She would also be capable of providing blood and saliva?
A. Yes.
Q. You did not use neither [*sic*] Harold Oliver or [S.S.]?
A. No."

■ As a general rule, the prosecution is not permitted to make arguments that diminish the presumption of innocence. *People v. Harbold*, 124 Ill. App. 3d 363, 371, 464 N.E.2d 734, 741 (1984). In particular, the prosecution should not comment on the failure of the defendant to present evidence. *People v. Wills*, 151 Ill. App. 3d 418, 421, 502 N.E.2d 775, 777-78 (1986). However, if a defendant attacks evidence presented by the prosecution, the prosecution may point out that the evidence is uncontradicted in order to show the lack of evidentiary basis for the defense's argument. *People v. Gant*, 202 Ill. App. 3d 218, 224, 559 N.E.2d 923, 927 (1990). Such comment is permissible so long as the prosecutor does not tell the jury that the defendant must provide evidence establishing reasonable doubt of his guilt. *People v. McKinley*, 242 Ill. App. 3d 124, 132, 609 N.E.2d 720, 725 (1992).

■ Accordingly, in the instant case it was proper for the prosecution to bring out on cross-examination that the defense criticisms of the prosecution's expert witnesses were not based on any independent testing that it had done. However, insofar as the questioning focused the jury's attention on the defendant's failure to introduce any serology evidence that was favorable to the defense, it was improper. *Harbold*, 124 Ill. App. 3d at 372, 464 N.E.2d at 742.

Nevertheless, in this case any such error was harmless. Given the strength of the case against the defendant, in our view, the questions that were improper did not materially contribute to the conviction. *Gant*, 202 Ill. App. 3d at 224, 559 N.E.2d at 927.

IV

The defendant's next contention is that the probability statistics

derived from Dr. Deadman's DNA testing were substantially more prejudicial than probative. First we note that this issue has been waived. While the defendant previously raised some issues concerning Dr. Deadman's testimony, this particular issue first appears in this appeal. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). However, we elect to consider the merits of this issue.

■ The Illinois Supreme Court recently ruled in *People v. Hickey*, 178 Ill. 2d 256, 687 N.E.2d 910 (1997), *cert. denied*, 524 U.S. 955, 141 L. Ed. 2d 742, 118 S. Ct. 2375 (1998), that the FBI's method of calculating statistical probabilities based on DNA tests is acceptable under *Frye*. The court cited a 1996 National Research Council Report concluding that "[t]he state of the profiling technology and the methods for estimating frequencies and related statistics have progressed to the point where the admissibility of properly collected and analyzed DNA data should not be in doubt." National Research Council, The Evaluation of Forensic DNA Evidence: An Update 36 (National Academy Press 1996).

Although the admissibility of DNA evidence and the probability statistics based upon it has been a subject that has much divided Illinois courts (see generally *Dalcollo*, 282 Ill. App. 3d 944, 669 N.E.2d 378), *Hickey* is the Illinois Supreme Court's latest decision on the particular issue that has been raised by the defense. Accordingly, we hold that the trial court did not abuse its discretion in allowing testimony involving the statistics in question.

## V

The defendant also argues that the trial court erred in qualifying Dr. Deadman as an expert witness in population genetics, the field that allows one to calculate statistical probabilities based on the results of a DNA test. The defendant contends that Dr. Deadman did not have the requisite qualifications because he had not taken university courses or obtained a degree in population genetics. Furthermore, the defendant argues, Dr. Deadman has never previously been qualified in a trial as an expert witness in population genetics, since in all previous cases there was a separate expert to address that aspect of the test results.

We find that the court properly qualified Dr. Deadman. Dr. Deadman testified that he has taken courses in population genetics, albeit not at a university. He has reported results in over 1,000 cases and has been qualified as an expert in over 200 trials or hearings. While this experience was not in population genetics *per se*, it was closely related and often depended on some knowledge of it.

■ ■ The Illinois Supreme Court has set out the standard for

qualification of an expert witness in *People v. Miller*, 173 Ill. 2d 167, 670 N.E.2d 721 (1996):

"Whether an individual is an expert on a particular subject is a matter generally reserved to the sound discretion of the trial court. [Citation.] An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusions. [Citation.] An expert need only have knowledge and experience beyond that of the average citizen. [Citation.] There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research." *Miller*, 173 Ill. 2d at 186, 670 N.E.2d at 730.

Clearly Dr. Deadman has knowledge and experience of population genetics beyond that of the average citizen. The trial court did not abuse its discretion in finding that Dr. Deadman met this standard. See *People v. Contreras*, 246 Ill. App. 3d 502, 615 N.E.2d 1261 (1993).

## VI

■ The defendant next contends that the trial court committed reversible error in not asking the venire a suggested question concerning possible racial biases against African-Americans. Whether to allow supplemental questions in *voir dire* rests in the discretion of the trial court. *People v. Peeples*, 155 Ill. 2d 422, 459, 616 N.E.2d 294, 311 (1993); *People v. Bunch*, 159 Ill. App. 3d 494, 510, 512 N.E.2d 748, 759 (1987).

A trial judge must question the venire about racial prejudice if special circumstances exist raising a constitutionally significant likelihood that racial prejudice might infect a defendant's trial. *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311. "Such circumstances exist where racial issues are 'inextricably bound up with the conduct of the trial.' " *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311, quoting *Ristaino v. Ross*, 424 U.S. 589, 596-97, 47 L. Ed. 2d 258, 264, 96 S. Ct. 1017, 1021 (1976). During *voir dire* the assistant State's Attorney said:

"Judge, I would note for completeness of the record at this point the complaining witness in this case is also African-American as are at least two of the circumstantial witnesses as are two of the officers."

With this information before it, the trial court did not err in concluding that there were no special circumstances. *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311.

■ The standard for determining whether the trial court has abused its discretion in not asking a question of the venire is "whether

the means employed to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *Bunch*, 159 Ill. App. 3d at 510, 512 N.E.2d at 759; *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311. In this case, the trial court did ask the potential jurors whether there was anything about the victim and the defendant that would keep them from giving the defense and the prosecution a fair trial. Under the particular circumstances of this case, this was sufficient.

## VII

The defendant argues that the trial court erred by allowing evidence from which the jury could infer that he had prior criminal convictions. According to the defendant, despite the fact that the court had the portion of the photos with the Department of Corrections (DOC) plaque removed, the photos were still recognizable as mug shots, because of the side-by-side front and profile shots against a white background.

Also, the defense moved for a mistrial, which the trial court denied, when the prosecution elicited evidence that the defendant had a DOC identification number prior to his arrest for the assault against S.S.. Detective Lewis Schubrych testified:

"Q. Were you able to identify him using any sort of identification numbers?

A. That's the way I identified him, from the department of corrections number.

Q. Were you also able to identify him based on a photograph that Harold Oliver had in his possession?

A. Yes, that's correct.

Q. Did that photograph also contain his identification number?

A. Yes it did."

As a rule, mug shots of the defendant should not be admitted if they would tend to inform the jury of previous unrelated offenses. *People v. Arman*, 131 Ill. 2d 115, 123, 545 N.E.2d 658, 662 (1989). However, testimony concerning mug shots may be introduced to show how a defendant was initially linked with an offense, if identification is a material issue at trial. *Arman*, 131 Ill. 2d at 123, 545 N.E.2d at 662. The testimony concerning the DOC number that was on the photo was admissible under this principle. The reference was quite brief and relevant to the initial identification of the defendant.

The photo array was evidence relevant to the identification of the defendant, and identification was a material issue. Police photographs can be admissible to show that a witness' identification of the offender was reasonable. *People v. Sims*, 285 Ill. App. 3d 598, 607, 673 N.E.2d

1119, 1125 (1996). Despite the potential for prejudice, mug shots "may be admitted where they are probative of the issue of a defendant's identity and the manner in which an identification was made." *People v. Hughes*, 257 Ill. App. 3d 633, 639, 628 N.E.2d 1030, 1035 (1993). The initial identification of the defendant by S.S. was made from these photos. Even if the admission of the mug shots were erroneous in this case, such admission would not automatically warrant reversal. *Arman*, 131 Ill. 2d at 123, 545 N.E.2d at 662. The trial court minimized any prejudice by having the portion of the photos with the DOC plaque removed. We hold that the probative value of the photo array outweighed undue prejudice in this case.

## VIII

The defendant next argues that the trial court committed reversible error in allowing the prosecution to make reference to the victim's family. There was a brief reference to S.S.'s children in opening argument ("She was living in an apartment with three of her children, her three children grammar school, high school age"), in closing argument ("And she told you what happened. *** She had to get her three kids ready for school and on their way before she went to go catch the bus, so she could go") and on direct examination ("I live with my kids").

█ Generally, the prosecution should not make reference to the victim's family if it has no bearing on the guilt or innocence of the defendant. *People v. Bernette*, 30 Ill. 2d 359, 197 N.E.2d 436 (1964). However, brief and isolated comments often will not amount to reversible error. *People v. Terrell*, 185 Ill. 2d 467, 494-95, 708 N.E.2d 309, 332 (1998). Since the prosecution did not dwell upon the victim's family, the comments were not sufficiently inflammatory to constitute reversible error. *Terrell*, 185 Ill. 2d at 513, 708 N.E.2d at 332. The comments were brief and incidental and so, in our view, the defendant was not materially prejudiced. *Sims*, 285 Ill. App. 3d at 612, 673 N.E.2d at 1128.

## IX

█ Next the defendant contends that the trial court erred in refusing to allow a courtroom demonstration. The defense wished to have actors show that, given the position in which the defendant allegedly dragged the victim, she could not have seen the scar on the right side of his face. Whether to allow courtroom demonstrations is discretionary. *People v. Harp*, 193 Ill. App. 3d 838, 843, 550 N.E.2d 1163, 1166 (1990). In deciding whether the trial court abused its discretion reviewing courts look "primarily to whether the demonstration is probative of facts in issue and whether it is conducted under

substantially similar conditions and circumstances as those which surrounded the original occurrence." *Harp*, 193 Ill. App. 3d at 843, 550 N.E.2d at 1166. In this case, the proposed demonstration was not especially probative, since, according to S.S.'s testimony, she had the opportunity to see the defendant's scar when she was in the vestibule. Moreover, one might question whether the circumstances in court were adequately similar to those surrounding the assault.

## X

■ Finally, the defendant contends that he was not proven guilty beyond a reasonable doubt. When a defendant challenges a conviction on the grounds of insufficient evidence, he or she must show that, looking at the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Clemmons*, 277 Ill. App. 3d at 923, 661 N.E.2d at 484.

This court found in *Oliver I*, 265 Ill. App. 3d 543, 637 N.E.2d 1173, that substantially the same evidence as presented in this trial was sufficient to convict this defendant beyond a reasonable doubt. A positive identification from a credible witness may be sufficient to sustain a conviction, even if there are alibi witnesses. *Oliver I*, 265 Ill. App. 3d at 553, 637 N.E.2d at 1180. Here there was a credible identification corroborated by physical evidence. In this case, we hold that the evidence adduced was sufficient to establish the defendant's guilt beyond a reasonable doubt.

For the foregoing reasons, the defendant's convictions are affirmed.

Affirmed.

GORDON, P.J., and RAKOWSKI, J., concur.