SECOND DIVISION

JUNE 13, 2000

1-98-2404, 1-98-2556 & 1-98-2557 (consolidated)

THE PEOPLE OF THE STATE  ) Appeal from the

OF ILLINOIS,  ) Circuit Court

  ) of Cook County

Plaintiff-Appellee  )

  ) 

v.  ) No. 97-CR 11558

  )

DERRICK HARRIS, ERSKINE DELOACH )

AND SAMMY LOWERY,  ) The Honorable

  ) Themis N. Karnezis,

Defendants-Appellees.  ) Judge Presiding.

PRESIDING JUSTICE COUSINS delivered the opinion of the

court:

After simultaneous but severed bench trials, the defendants were each convicted of aggravated criminal sexual assault, home invasion, armed robbery, aggravated kidnaping, aggravated battery of a senior citizen, residential burglary, burglary and possession of a stolen motor vehicle.  The trial court sentenced the defendants to four consecutive terms of 30 years' imprisonment, totaling 120 years each.

The defendants appeal, arguing that: (1) the trial court erred in denying a motion to suppress confessions that were allegedly coerced; (2) the judge improperly admitted DNA evidence as to defendant Derrick Harris that did not meet scientific standards; (3) the evidence was not sufficient to prove Sammy Lowery or Erskine DeLoach guilty beyond a reasonable doubt; and (4) the trial court abused its discretion in imposing the maximum possible sentence on all the defendants.

BACKGROUND

On February 22, 1997, Louise Watson was 74 years old.  She lived with her son Kevin and his daughter Monica, who was 15 at the time.  Kevin's six-year-old twin daughters were visiting for the weekend.  At trial she testified as follows.

Louise had gone to bed around 9:30 or 10 p.m.  Her twin granddaughters slept in the bed with her.  At approximately 4 a.m. she was awakened by someone turning on the light.  She heard a man say "Give me the money, give me the money."  She said "Who are you?  Who are you? Get out of my house."  Then her son said "Mom, give him what he wants."  She saw that there were four young men in the room along with her son Kevin.  All four of the intruders had handguns.  One of them had his gun pressed to the back of Kevin's head.  She identified the four men in court as Sammy Lowery, Derrick Harris, Erskine DeLoach and Dante Handy.  The men were saying gang slogans.  Lowery said he ought to kill her son.  She quieted the twins, who were crying, and gave Lowery the money in her purse, which amounted to about $12.  Lowery took her into the hall and whispered to her not to tell the others that she had given him the money.  Louise, however, said to the other men: "I gave him the money.  I gave him all I have."

Lowery went into Monica's room.  He grabbed her out of bed and then took her into her father's room.  Louise was following him, saying "Leave my granddaughter alone."  She repeatedly tried to pull Monica away from him, but each time he pushed her away.  He had torn off Monica's shorts and underwear, leaving her wearing only a T-shirt.  Lowery then dragged Monica back out into the hall.  Harris and DeLoach were taking the television and videocassette recorder.  Handy still had his gun against Kevin's head.

The defendants then left, carrying Monica with them.  Louise tried to stop them, but one of them knocked her down into the snow.  They put Monica in Kevin's van and drove off.  One of the defendants had torn the phone cord out of the wall, but Kevin also had a cordless phone, on which he called the police.  The police arrived promptly.  Later, as they were giving information to the police, Monica ran into the house, saying that she had been raped.  She was immediately taken to the hospital.

Kevin Watson testified as follows. He was a school bus driver.  On Sunday February 23, 1997, he had awakened before dawn, as was his custom, and prepared to go to Indiana to buy gas and cigarettes.  He sat drinking coffee in the van while the engine warmed up.  A station wagon pulled up and four men got out.  Two came up on either side of the van.  One pointed a handgun at him and ordered him out.  After taking the money he had on his person, which only amounted to about $6 or $7, they forced him to let them into the house.  They took him through the house, with guns pressed against him.  They went to his mother's room and forced him to his knees, and eventually made him lie on the floor.  One of the intruders held a gun to his head all the while.  He could hear struggling and crying and saw that his daughter was being dragged around.  A little later he felt the barrel of the gun leave his head.  Shortly afterwards the front door slammed.  He got up and dialed 911 on his cordless phone and then called his neighbor, who was a police officer.  Later, while he and his mother were giving information to the police, Monica drove up in the van.  She left it in the middle of the street.   She ran straight to him screaming, wearing only a T-shirt.  They took her to the hospital right away.

Monica testified that on February 22, 1997, she went to bed at about 1 a.m.  She was awakened by the sound of her grandmother screaming.  Two men carrying handguns entered her room.  She identified these men in open court as Handy and DeLoach.  DeLoach took her into the hallway.  Then Lowery grabbed her and took her into her father's room, where he pulled off her shorts and underwear.  Lowery tried to rape her several times in various parts of the house, but did not succeed because Louise would not stop struggling with him. He kept throwing Louise off and she fell into things.  Monica saw Harris carry off the television.  Lowery said "We got to take the bitch with us" and started dragging Monica off.  He took her out and put her in the back of the van, pushing Louise into the snow.  The other three men then got in the van and they left, with Harris driving. 

Once in the van, the men raped her multiple times, orally anally and vaginally.  Lowery made her remove her shirt.  At one point Handy took over driving from Harris, so that Harris would also have an opportunity to rape her.  After they were finished, Handy said they should put her out of the van.  When Lowery refused, Handy raised his weapon and threatened to shoot her.  Lowery told Monica that he should have "fucked" her grandmother.  He asked her if she had ever had sex before, and if she had ever had oral sex.  He asked if she would go home with him and if she would be his girlfriend.

The van stopped and the four men got out.  Monica asked for her shirt back and Lowery gave it to her.  After a minute she tried to start the van, but could not.  She then lay back down in the back seat.  DeLoach and Lowery got back in.  Lowery again made her perform oral sex on him and again asked her if she had ever had sex and if she would be his girlfriend.  Then DeLoach made her look him in the face and he told her that if she told anyone what had happened they would kill her family.  DeLoach gave her directions to her house and she drove off.

Shoshana Strader testified that she lived across the hall from Handy.  She came back from a party at about 4 or 5 a.m. on February 23, 1997.  As she walked up the stairs to her apartment, she saw Handy come up the stairs with a revolver.  She asked him where Harris was and he did not reply.  About five minutes later Harris knocked at the front door and came in carrying a television set.  About five minutes after that DeLoach and Lowery came in the back door.  Lowery's penis was hanging out of his pants.  Lowery said that they had just finished "fucking this bitch."  

Latrice Riley, an ex-girlfriend of DeLoach's, who also lived in the apartment, asked what "bitch" they had "fucked."  DeLoach denied having "fucked" anyone, but while he said this he pointed a gun at Riley's head.  Handy said that he had never done anything like this before and that he was going to kill himself.  The next day Harris came back to get the television.  The day after that DeLoach stopped by.  Riley accused him of having raped "the girl in the paper."  DeLoach replied "How did you hear about this?  You not telling anybody about this are you?" 

Riley testified that Harris and Lowery came to the back door after Strader returned.  Lowery's penis was out.  She asked him "Why you got your nasty-ass dick hanging out?"  Lowery replied that he had just "got through fucking the shit out of some bitch."  When Riley asked him who he meant, he said "Me and Derrick" and then added Handy.  He said DeLoach had not.  Lowery also said that he had "knocked the shit out of that old lady" because she had choked him.

Regina Cobbs is Strader's niece. Cobbs testified that shortly after Strader returned home on the morning of the 23rd, Harris came in carrying a television set.  Lowery and DeLoach then entered.  Lowery's penis was exposed.

Lowery's mother testified that she and her husband had a wedding anniversary party on the night of February 22 and that the party lasted into the early morning of the 23rd.  She testified that Lowery went to his room and did not leave until the afternoon of the 23rd.  Lowery's father testified that at 4 a.m. when he fell asleep, Lowery was still at the party.  One of Lowery's sisters testified that he was at the party when she left about 2 or 3 a.m.  Another sister testified that Lowery was present when she left around 3:30 or 4 a.m with her boyfriend, Sean Smythe.  Smythe also testified that Lowery was present when they left, but he said that the time was around 2 or 3 a.m.  Lowery's brother testified that Lowery was at the party when he left at 4 or 4:30.  Lowery's aunt testified that he was there when she left at about 1 or 2.  Lowery's girlfriend testified that he was there when she left at about 3 or 4 in the morning.

Latisha Hill testified that she was with Lowery in his bedroom from the time the party broke up until 6:45 a.m., at which time Lowery went to sleep.  On cross-examination the witness stated that she liked Lowery and at one time she had a "crush" on him. 

After the crime, Monica, Kevin and Louise Watson viewed photo arrays in order to identify the perpetrators.  Among the photographs that each initially picked out was one of Matthew Agnis.  Mr. Agnis has not been charged.  They also viewed lineups. At the first lineup, all three picked out Lowery and DeLoach.  At another lineup, all identified Handy.  And finally in a third lineup Louise and Monica identified Harris.

At the hearing on the motions to suppress statements, Detective Karen Morrissette testified that she was assigned to investigate the instant crimes.  On April 3, 1997, she and assistant State's Attorney (ASA) Vicki Klegman interviewed Derrick Harris after informing him of his 
Miranda
 rights.  Harris was cooperative and even eager to talk and he signed a statement dictated to Klegman. 

Harris' mother testified that she was called to the police station on the evening of April 3, 1997.  She arrived and saw Harris about 11:30 p.m. She testified that his eyes were red and his face was puffy and that it looked like he had been hit or slapped in the face.  He told her that he had been beaten by a police officer.  Klegman testified in rebuttal that Harris' eyes were red and his face looked puffy because he had been crying because he was embarrassed that he had not been able to achieve an erection "when he tried to have sex with the girl."

Harris testified that he was arrested about 6 a.m. and put into an interrogation room.  A police officer told him that the other arrestees were trying to put the blame for everything on Harris.  He told Harris "all we want you to do is say you took the TV and VCR and we'll let you go from the police station."  A female ASA came in and read him statements from the other arrestees.  She encouraged him to talk since the others were blaming everything on him.  Then the police officer returned and presented Harris a statement to sign.  When Harris refused, the officer began to beat him, hitting him in the face and stomach for about 15 to 20 minutes until Harris agreed to sign.

Officer Rickey Boone testified that he arrested Erskine DeLoach on February 27, 1997.  His partner read DeLoach the 
Miranda
 warnings.  Boone stated that DeLoach confessed within an hour of being taken into custody.  DeLoach was well treated and was not kept in handcuffs.  Boone simply asked DeLoach "What happened?" and DeLoach talked about his involvement in the crime.  Then DeLoach accompanied Boone to Lowery's residence, where officers arrested Lowery at about 4 a.m.  Then they went back to the police station.  ASA Neena Scaria took DeLoach's statement at about 3:30 p.m. the next day.  DeLoach reviewed the statement and made corrections. The statement contained an acknowledgment of his constitutional rights. 

DeLoach testified that no one read him his 
Miranda
 rights.  He stated that he was beaten by several police officers.  One of the officers said that he was a member of the victim's family.  After about two hours he agreed to sign a statement.  He also signed a photograph of himself purportedly taken immediately after he gave the statement.  On redirect DeLoach identified a photograph of himself taken at Cook County jail on March 1, 1997.  He said that the photograph showed the bruises on his face from the beating.

Lowery was arrested at around 4 a.m. on February 27, 1997.  He was transported to the station by Detective Morrissette and Detective Maverick Porter.  Morrissette testified that Lowery said he wanted to discuss the crime while they were in the car, but she told him to wait until they got to the station.  Lowery was put in an interview room.  Porter read him his rights, and Lowery indicated that he understood them.  Then Porter left, and Lowery told Morrissette all about his involvement in the crime.

ASA Ed Maloney came in about 11:40 a.m.  Lowery showed no signs of mistreatment.  Maloney testified that he read the 
Miranda
 warnings to Lowery.  Lowery then started talking and eventually signed a statement.  Lowery reviewed the statement and made corrections.

Lowery testified that he was arrested by about 15 police officers and that he was beaten at the time of his arrest.  He was never read his rights.  He said that he was also beaten at the station by an officer who claimed that the rape victim was his niece.  He eventually signed a statement because he was scared.

Handy, who is not part of this appeal, was arrested in Texas.  He also claimed that the police coerced him to confess through physical abuse.

The trial court, after hearing all the evidence, denied the motions to suppress. 

Tracy Gallagher, a forensic scientist, was qualified as an expert witness.  She testified that she conducted DNA tests using the "Restriction Fragment Length Polymorphism" (RFLP) method on samples provided to her.  The samples came from the T-shirt that Monica had been wearing and swabs with samples of bodily fluids from her mouth, vagina and rectum.  For one DNA specimen, she obtained a match for Lowery.  The pattern that she found would be expected to occur in approximately 1 in 4.2 billion blacks.  Another sample matched Harris, with a probability of 1 in 14 billion blacks.  For other samples she obtained incomplete results that could have come from Lowery, Harris and Handy, but the statistical significance was much lower.  She did not find a match for DeLoach.  The samples that did not contain enough DNA for RFLP testing were sent for "Polymerase Chain Reaction" (PCR) testing.

Karla Cluck, another forensic scientist, was also qualified as an expert witness.  She performed PCR tests on the samples provided.  Cluck explained that when a sample is mixed and contains more than one person's DNA, the test provides much lower probabilities than from a sample from a single person.  She found that the sample from the oral swab did not exclude Harris, Handy or Lowery.  The frequency of the profile was 1 in 4 blacks.  The specimen from the rectal swab similarly could not exclude Handy, Harris or Lowery.  The frequency of the profile was 1 in 20 blacks.  One of the samples excluded DeLoach.  Others did not exclude him and the other defendants.  They had frequencies of occurrence of 1 in 1, 1 in 2, 1 in 3, and 1 in 10 blacks.

Some of the samples from the shirt displayed the profile of an individual that did not match either Monica's or the defendants' profiles.  Cluck testified that this did not necessarily indicate the presence of a fifth offender, however.  One of the reasons that PCR is used is that it can detect very small amounts of DNA.  That amount could have resulted from biological fluid other than blood or semen, such as saliva, sweat or mucus from sneezing.

Kimberly Young, another forensic scientist, testified that a fingerprint of Harris was found at the crime scene.

Dr. Sandy Zabell, a professor of mathematics and statistics at Northwestern University, testified for the defense.  According to Dr. Zabell, the RFLP tests that produced incomplete results were inconclusive, and there was not a legitimate scientific basis to calculate probabilities at all based on the incomplete results.  He did not, however, quarrel with the figures derived from the full RFLP matches.

The trial court found Harris, Lowery and DeLoach guilty of all charges.  Handy, who opted for a simultaneous jury trial, was also convicted on all counts.  After a sentencing hearing, at which evidence in aggravation and mitigation was presented, the trial judge sentenced them each to the maximum possible sentence: four consecutive 30-year terms of imprisonment each for a total of 120 years.

Harris, Lowery and DeLoach now appeal, arguing that: (1) the trial court erred in denying the motion to suppress the allegedly coerced confessions; (2) the judge improperly admitted DNA evidence against Harris, 
i.e.
, PCR testing and the partial RFLP results, that did not meet scientific standards; (3) the evidence was not sufficient to prove Lowery or DeLoach guilty beyond a reasonable doubt; and (4) the trial court abused its discretion in imposing the maximum possible sentence on all the defendants.

ANALYSIS

I

We first address the defendants' contention that the trial court erred in denying their motions to suppress statements.  The State has the burden to show by a preponderance of the evidence that a confession was voluntary if a defendant claims it was coerced.  
People v. Case
, 218 Ill. App. 3d 146, 154, 577 N.E.2d 1291, 1297 (1991).  In deciding whether a statement was freely given, a trial court is to look at the totality of the circumstances surrounding the making of the statement.  
People v. Brown
, 169 Ill. 2d 132, 144, 661 N.E.2d 287, 292 (1996).  A trial court's finding regarding the voluntariness of an inculpatory statement is not to be disturbed unless it is against the manifest weight of the evidence.  
Brown
, 169 Ill. 2d at 144, 661 N.E.2d at 293.

In the instant case, the decision regarding the inculpatory statements also deserves deference in that it turned on credibility judgments. See 
Braun-Skiba, Ltd. v. La Salle National Bank
, 279 Ill. App. 3d 912, 920, 665 N.E.2d 485, 491 (1996) (reviewing court will defer to trial court's credibility determinations unless against the manifest weight of the evidence).  If the police and ASAs were truthful, then the confessions were clearly voluntary.  If the defendants were truthful, then the confessions were just as clearly coerced.  Here the trial court chose to believe the prosecution witnesses.  We cannot say that such a finding was against the manifest weight of the evidence.

II

Harris claims that the court erred in admitting PCR test results and "partial matches" into evidence without first holding a 
Frye
 hearing.  See 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  The determination of whether to admit evidence about novel scientific techniques rests in the discretion of the trial court.  
People v. Eyler
, 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285 (1989).  In order to be admissible, the principle or technique on which the expert testimony is based must have gained general acceptance in the particular field in which it belongs.  
Frye
, 293 F. at 1014.  This court has held that PCR testing is generally accepted in the relevant scientific community and thus is admissible under 
Frye
.  
People v. Oliver
, 306 Ill. App. 3d 59, 66, 713 N.E.2d 727, 734 (1999).

We next consider the "partial matches" from the RFLP tests.  The RFLP testing performed on two of the samples recovered from the victim showed some of the bands that were in Harris' profile, but not others.  Harris does not challenge the admissibility of RFLP testing in general, nor the calculation of probabilities based on complete matches.  The Illinois Supreme Court held these admissible in 
People v. Hickey
, 178 Ill. 2d 256, 278, 687 N.E.2d 910, 921 (1997).  Rather, Harris takes issue with the calculation of probabilities from the incomplete matches and with calling them matches at all.  The defense expert testified that this was not accepted scientific practice.

The trial court ruled that Harris' objections went to the weight rather than the admissibility of the evidence.  Although the judge refused to hold a 
Frye
 hearing, he listened to detailed argument made by Harris' counsel that explained why he thought the evidence should not be admitted.  In our view, the trial court in the instant case did not abuse its discretion in deciding that this particular matter went to the weight and not to the admissibility of the evidence.  See 
Hickey
, 178 Ill. 2d at 278-79, 687 N.E.2d at 921.

Moreover, any error would be harmless in the face of the other RFLP DNA evidence against Harris, not to mention all the other evidence of his guilt.  The defense expert did not dispute that the RFLP test that provided the 1 in 14 billion result was a legitimate match.  Nor did he say that anything was wrong with the statistical calculations that led to the 1 in 14 billion figure. See 
People v. Young
, 269 Ill. App. 3d 120, 124, 645 N.E.2d 533, 536 (1994).

III 

Lowery claims that, in light of the testimony from multiple witnesses that he was at a party at the time of the crime, there was a reasonable doubt as to his guilt.  In order to establish that there was insufficient evidence to convict, a defendant must show that "looking at the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  
Oliver
, 306 Ill. App. 3d at 74, 713 N.E.2d at 739.   In this case there was sufficient basis to convict Lowery.  First, there were two very strong DNA matches, with probabilities of 1 in 4.2 billion and 1 in 48 million, respectively.  Also, he was identified by the victims in lineups and in open court.  Other witnesses testified that he essentially admitted his guilt subsequent to the crime.  Finally there is his confession.  Lowery had alibi witnesses, but "[a] positive identification from a credible witness may be sufficient to sustain a conviction, even if there are alibi witnesses."  
Oliver
, 306 Ill. App. 3d at 74, 713 N.E.2d at 739.  In the light the overwhelming evidence in this case, it was not unreasonable for the trial court to disbelieve the alibi testimony from Lowery's family and friends.

DeLoach similarly claims that there was insufficient evidence to prove him guilty beyond a reasonable doubt.  In support of this argument DeLoach notes that there was a dearth of reliable physical evidence linking him to the crime.  And DeLoach denied to Riley that he had participated in the rape.  However, it must kept in mind that he was pointing a gun at her when he made that statement.  And when she accused him of raping "the girl in the paper," he said "You not telling anybody about this are you?"  While DeLoach is correct that the DNA evidence did not inculpate him, neither did it exculpate him.  As with Lowery, the victims identified DeLoach in lineups and in open court.  Also as with Lowery, there was a confession.  Based on this evidence, we cannot say that no rational trier of fact could have found DeLoach guilty beyond a reasonable doubt.

IV

The defendants next contend that the trial court abused its discretion in imposing the maximum possible sentence upon each of them.  The defendants do not argue that consecutive sentences were improperly imposed under the sentencing code. 730 ILCS 5/5-

8-4(a) (West 1996).  They argue, rather, that the sentence on each individual count was excessive.  However, it is only proper to disturb a sentence within the statutory limits if the sentence constitutes an abuse of the trial court's discretion.  
People v. Daniels
, 113 Ill. App. 3d 523, 532, 447 N.E.2d 508, 514-15 (1983).  It is not enough that we might have imposed a different sentence in the trial court's place.  
People v. Smith
, 81 Ill. App. 3d 764, 774, 401 N.E.2d 1017, 1024-25 (1980).  

The trial court in this case did not expound at length on the reasons for its sentence
.  However, there is "a strong [legal] presumption that a trial court's sentencing decision is based upon proper legal reasoning, and the court will be presumed to have considered any evidence of mitigation which is before it." 
People v. Partin
, 156 Ill. App. 3d 365, 373, 509 N.E.2d 662, 667 (1987).

The defendants were convicted of aggravated criminal sexual assault, home invasion, armed robbery, aggravated kidnaping, aggravated battery of a senior citizen, residential burglary, burglary and possession of a stolen vehicle.  The evidence of the repeated acts of aggravated criminal sexual assault committed by the defendants against the 15-year-old minor victim is horrific.  She was dragged from her bed.  The shorts and underwear were torn from her body.  She was abducted from her home while wearing only a T-shirt by the defendants, who drove away in her father's van.  Inside the van, the defendants committed monstrous acts of aggravated sexual assault against her.  After they had finished dehumanizing her, they let her drive home in the van.

No life-threatening injuries were inflicted.  But one of the victims was a senior citizen and another was a minor.  Harris was only 20 years old at the time of the incident.  However, he had previously been sentenced to six years' imprisonment for delivery of a controlled substance. (He was paroled through the boot camp program.)  Lowery and DeLoach were only 22 and 21 years old, respectively, at the time of the incident.  They had committed offenses as juveniles but had no adult convictions.  Witnesses testified that Lowery walked around after the incident with his penis hanging out and bragged about his participation in the offense.

On appeal, absent an abuse of discretion, the sentence imposed by the trial court will not be disturbed.  
Daniels
, 113 Ill. App. 3d at 532, 447 N.E.2d at 514-15.  After reviewing the evidence in the instant case, although we acknowledge the sentences are harsh, we cannot say that the sentences constitute an abuse of discretion.

For the foregoing reasons the decision of the trial court is affirmed. 

Affirmed. 

McNULTY and McBRIDE, JJ., concur.