# Illinois Official Reports

## Appellate Court

---

## *People v. Applewhite*, 2016 IL App (4th) 140558

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KAWQUAUN APPLEWHITE, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0558 |
| Filed | December 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 12-CF-531; the Hon. Craig H. DeArmond, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Warner S. Brockett, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>David J. Robinson and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of Springfield, of counsel, for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justice Appleton concurred in the judgment and opinion.<br>Justice Turner specially concurred, with opinion. |

**OPINION**

¶ 1        Following an October 2013 trial, a jury convicted defendant, Kawquaun Applewhite, of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2012)). In April 2014, the trial court sentenced defendant to four years in prison and imposed a $1250 fee for court-appointed counsel.

¶ 2        Defendant appeals, arguing that (1) the trial court abused its discretion by admitting multiple hearsay statements the victim made to others pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2012)), (2) the court erred by prohibiting defense counsel from questioning venire members individually about personal experiences they or their family members had with sexual abuse, and (3) this court should vacate the fee for court-appointed counsel that the trial court improperly imposed without first conducting a hearing as required by section 113-3.1 of the Code (725 ILCS 5/113-3.1 (West 2012)). For the reasons that follow, we (1) affirm defendant's conviction and sentence and (2) vacate the order regarding the fee for court-appointed counsel.

¶ 3                                    I. BACKGROUND
¶ 4                                A. The State's Charges
¶ 5        In November 2012, the State charged defendant with (1) predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and (2) aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2012)), alleging that six months earlier, defendant had sexual contact with G.Z. (born January 4, 2002), who was then under 13 years old.

¶ 6        In January 2013, the State filed an amended notice of its intent to solicit corroborative testimony detailing complaints G.Z. made to others under section 115-10 of the Code, which provides an exception to the prohibition against admitting hearsay testimony as substantive evidence in cases involving sexual acts perpetrated against a child under 13 years old.

¶ 7                                B. Pretrial Proceedings
¶ 8        At a February 2013 pretrial hearing, the trial court considered the following evidence on the State's amended section 115-10 notice.

¶ 9        Austin Hardy testified that he was married to Amber Hardy, and they shared a home with their children, G.Z. (11 years old), Z.Z. (9 years old), A.H. (6 years old), and L.H. (4 years old). On November 8, 2012, Austin came home from work earlier than usual. After entering unnoticed through the rear door, Austin heard children playing in the basement but decided to go to the bathroom before announcing his arrival.

¶ 10        Defendant supervised Austin's four children while Austin worked. Austin explained that he met defendant "three, maybe four years" earlier through Amber's coworker, Emily Newton, who had been in a relationship with defendant. During that time, Austin's friendship with defendant developed to the point where Austin trusted defendant "with my life and my kids." Because other people Austin hired proved untrustworthy, Austin asked defendant to supervise his children during the days he and Amber worked.

¶ 11        As Austin walked to his locked master bedroom, he stopped to get a key from a closet located directly across from a hallway bathroom. G.Z., who was then 10 years old, emerged from the hallway bathroom, which Austin noticed was unlit. G.Z. asked Austin to follow her

because she wanted to show him a dead spider. When G.Z. could not find the spider, Austin started walking back toward his bedroom. G.Z. then attempted to get Austin to go downstairs. Austin told G.Z. that he had to go to the bathroom. When Austin turned toward the master bedroom, he saw light coming from the open hallway bathroom door. Austin estimated that his encounter with G.Z. lasted about two minutes.

¶ 12 When Austin reached the hallway bathroom, he saw defendant standing in front of the sink. Defendant inquired about the slow-draining sink. Defendant's question concerned Austin, because he and defendant had twice attempted, unsuccessfully, to fix the sink. Austin then went into his master bedroom. Two minutes later, defendant knocked on the master bedroom door and asked Austin to call Emily to determine whether she was ready to be picked up from her work. Defendant subsequently left with Emily's then four-year-old son, Z.N., whom defendant had also been supervising. That evening, Amber arrived home from work, and Austin informed her about his encounter with G.Z. and defendant. Amber went to speak with G.Z.

¶ 13 Austin was "in and out" of the front room where Amber spoke with G.Z. because he was taking care of their other children. Shortly after Amber confronted G.Z., Austin heard G.Z. throw up in the kitchen. After speaking with G.Z. for about 20 minutes, Amber contacted Emily because she was concerned about Z.N. Police later arrived at the Hardy home and separately questioned Austin, Amber, and G.Z. Austin acknowledged that G.Z. did not tell him what occurred with defendant. Austin added that one of the factors that prompted him to speak with Amber was G.Z.'s unusual and fidgety demeanor that day, commenting that G.Z. is usually giddy, happy, and wants to talk. However, that night, Austin noticed that G.Z. did not react as she normally does when he arrived home from work.

¶ 14 Amber testified that on November 8, 2012, defendant was at her home, watching her four children and Z.N. Amber explained that defendant had been supervising her children during the week from noon to approximately 5 or 6 p.m. for several months. After Amber arrived home from work that evening, she had a conversation with Austin. When Austin conveyed his concerns, Amber decided to speak with G.Z.

¶ 15 During their 10-minute talk, Amber (1) told G.Z. about how Austin got a "funny feeling" about the hallway bathroom encounter and (2) asked G.Z. if defendant had ever touched her inappropriately. G.Z. hesitated. When Amber asked again if defendant had touched G.Z. inappropriately, G.Z. started shaking, got up, and walked into the kitchen, where she threw up. After doing so, G.Z. returned and, according to Amber, stated the following:

> "[G.Z.] said that [defendant] pulled his thing out and asked her to kiss it, and she shook her head no, and then he turned her around and tried to tie her wrists up, *** placed his thing between her butt cheeks and started to hump her."

Amber recalled that G.Z. told her that defendant pulled her shorts down and then pulled his pants down before he began humping her. Amber observed that during G.Z.'s recitation of defendant's acts in the hallway bathroom, G.Z. was "visibly shaken" and hesitant, but she did not cry.

¶ 16 After informing Austin of G.Z.'s account, Amber met with Emily and told her about defendant's conduct with G.Z. because Amber was worried about Z.N. That night, Danville police officer Jon Stonewall privately interviewed G.Z. in the Hardys' home. The following morning, Amber took G.Z. to the police station, where Detective Scott Damilano privately

interviewed G.Z. Amber could not recall telling Stonewall whether G.Z. stated defendant asked her to wear a blindfold during the hallway bathroom incident.

¶ 17 Stonewall testified that on November 8, 2012, he responded to a call of a sexual assault at the Hardy residence. Upon arriving, Stonewall observed Austin, Amber, Emily, and G.Z. Stonewall conducted a private interview of G.Z. in the living room of the Hardy residence. Stonewall characterized G.Z.'s demeanor as meek and nervous.

¶ 18 G.Z. told Stonewall that she had been in the basement earlier that day wrestling with her siblings, Z.N., and defendant. At one point, G.Z. went to the hallway bathroom. When she exited, defendant was standing in the hallway. After G.Z. "play punched" defendant, he responded that G.Z. "better stop, or I'm going to make you kiss my balls." G.Z. returned to the basement, but she later went upstairs, intending to use the hallway bathroom again. Defendant followed G.Z. into the bathroom, closed the door behind him, and turned off the lights. Defendant pulled his trousers and underwear down and did the same with G.Z.'s shorts and underwear. Defendant then pulled G.Z. away from the sink, and as she faced away from defendant, he "put his penis on her buttocks and moved it back and forth" for about "10 to 15 minutes." During this time, G.Z. and defendant did not speak. Stonewall clarified that G.Z. (1) used the term "wiener" instead of "penis" and (2) did not try to get away from defendant. When G.Z. left the hallway bathroom, she was startled by Austin's presence and attempted to get him away from the hallway bathroom because G.Z. feared getting into trouble.

¶ 19 G.Z. revealed to Stonewall that the hallway bathroom incident was not the first time defendant touched her inappropriately. In summer 2012, G.Z. recalled an incident at defendant's home where she, her siblings, and Z.N. were wrestling with defendant. Later, when G.Z. was alone with defendant watching television in his bedroom, defendant exposed his penis and told G.Z. that he wanted her "to kiss his wiener." G.Z. told Stonewall that (1) defendant "used his fingers to manipulate her lips and touched his wiener to her mouth" and (2) "what had occurred in the bathroom at her home had also occurred a couple of times at [defendant's] house." Stonewall then asked Amber to come back into the room for the purpose of retrieving the underwear G.Z. had been wearing during the hallway bathroom incident. During the interview, G.Z. did not mention defendant tried to tie her up or asked her to wear a blindfold.

¶ 20 Damilano testified that on November 9, 2012, he interviewed G.Z. A recording of Damilano's interview, which the trial court reviewed, revealed the following.

¶ 21 After engaging G.Z. in general conversation regarding her age, schooling, family situation, and G.Z.'s basic knowledge of male and female anatomy, Damilano asked G.Z. questions regarding the circumstances surrounding the November 8, 2012, incident with defendant, which prompted the following responses from G.Z.

¶ 22 G.Z. characterized defendant as a "good friend of the family," and although G.Z. had numerous interactions with defendant over the previous years, defendant began supervising G.Z. and her three siblings about a month earlier on school days when Austin and Amber were at work. On November 8, 2012, defendant was supervising G.Z., her three siblings, and Z.N. at the Hardy home. After play wrestling in the basement, G.Z. went upstairs to the hallway bathroom. Defendant followed G.Z. into the bathroom and turned off the lights. G.Z. thought defendant "was still playing around" so she punched him in a playful manner. Defendant then told G.Z. that she was "going to kiss his penis." Thereafter, defendant pulled down his trousers and then proceeded to unbutton G.Z.'s pants and pulled them down as well. G.Z. then felt the

"back and forth movement" of defendant's penis on her buttocks, which was not painful but did not feel good. G.Z. described the contact as warm and nasty. G.Z. pulled up her pants and walked out of the bathroom, where she saw Austin. Thereafter, G.Z. attempted to get Austin away from the hallway bathroom because she thought she would get in trouble.

¶ 23    G.Z. added that in summer 2012, defendant engaged in this same behavior on two occasions. During the first incident, defendant watched her, her brother, and Z.N. in defendant's home while Austin and Amber were at work. G.Z. was in defendant's bedroom wrestling with defendant on his bed while the other children were playing in another room. At some point, defendant pulled his trousers down as well as G.Z.'s pants, got on top of G.Z., and started humping her. G.Z. clarified that defendant's penis was making contact with her buttocks as in the hallway bathroom encounter, except that defendant was lying on top of her as G.Z. was lying on the bed, looking away from defendant. G.Z. stated that "the exact same thing" happened during the second encounter at defendant's home.

¶ 24    Following argument, the trial court found that the "time, content, and circumstances of the statements, the testimony of the witnesses, the credibility of [G.Z.], who has testified here by way of video, all [the court] believe[s] are sufficient to allow the admissibility of the [section] 115-10 statements."

¶ 25    In June 2013, the State filed a supplemental notice of its intent to solicit corroborative testimony detailing statements G.Z. made to Lisa Moment, a nurse, pursuant to section 115-10 of the Code. At a July 2013 pretrial hearing, the State presented the following evidence.

¶ 26    On November 9, 2012, Moment performed a sexual assault examination of G.Z. As part of that process, Moment asked G.Z. broad questions regarding her understanding of why she was being examined. Moment recalled that G.Z. told her that "at some point [G.Z.] went to the bathroom. [Defendant] followed her into the bathroom and turned out the lights and pulled down his pants and her pants and started humping her." G.Z. clarified that "humping" meant "going back and forth." G.Z. agreed with Moment's description that defendant put his penis in G.Z.'s bottom. Moment characterized G.Z.'s demeanor during her recital of the events at issue as "very calm" and "pretty flat," which Moment did not find unusual. Moment acknowledged that she did not find any bleeding or tears during her physical examination of G.Z.

¶ 27    Following argument, the trial court found that the time, content, and circumstances of the statements provided safeguards of reliability sufficient to permit admission of Moment's testimony under section 115-10 of the Code.

¶ 28                                                C. *Voir Dire*

¶ 29    In October 2013, the trial court conducted *voir dire*, where the following exchange occurred outside of the venire's presence:

"[DEFENSE COUNSEL]: Due to the nature of the case, I think some inquiry is going to be made regarding personal and/or knowledge of sexual abuse issues. Our request *** would be to address those individually due to the obvious circumstances regarding those kind of issues, and the personal nature that they may—

THE COURT: [The court will] be asking questions about whether they have been the victim of any criminal offense. [The court will] also be asking them whether once they hear the nature of this offense, is there anything about that which affects their ability to be fair and impartial. [The court is] not inclined to inquire or ask people to

disclose in open court that they've been victims themselves. [The court will] ask questions that are designed to get that information out, and [the court] will also tell them that if at any time *** [the court] ask[s] a question which causes them any concern or anxiety and they don't feel comfortable answering it in open court, they have a right to talk with me privately. [The court] will call you up to tell you what they [said]. Nine times out of ten, that's when they come up, someone will say they were a victim of a rape, or victim of some sexual offense, and they don't want to disclose it in open court. They tell [the court] what the situation is. [The court will] then call the attorneys up at a side-bar and advise them of the situation, but as far as being allowed to inquire further about if, no. [The court will] cover it.

[DEFENSE COUNSEL]: You're barring us as a counsel?

THE COURT: Yes. [The court will] cover it, and if [the court] think[s] it needs further covering because of a response they give, then [the court will] have even more questions, but [the court's] questions are designed to get responses without people having to go through the stress of acknowledging in open court something of that nature. *** [I]n almost every jury[,] one or more persons ask to talk to [the court] privately and they come up and disclose their circumstance, and then [the court] let[s] the attorneys know. Once you hear the information, if you want further questions asked of that person, tell [the court] what questions you want asked and [the court will] ask them. Anything else?

[DEFENSE COUNSEL]: No. I just wanted to make sure our request for the individual ID—

THE COURT: It won't be done individually, but [the court] will make sure that there's individual inquiry if any of those people respond in a way that gives us some reason to believe that we need to ask some further questions."

¶ 30    Thereafter, during *voir dire* of 14 venire members, the trial court inquired, as follows:

"Have you or any members of your family ever been the victim of a criminal offense? Any of you have any bias or prejudice against a person merely because they have been charged with a criminal offense? Is there anything about the nature of the charges in this case, predatory criminal sexual assault of a child and aggravated criminal sexual abuse, just the charges themselves, is there anything about hearing those charges that affects you in such a way that you believe that it would prevent you from reaching a fair and impartial verdict?"

None of the venire members answered affirmatively.

¶ 31    After a sidebar conference held outside of the jury's hearing, the trial court asked the following questions:

"[The court] asked you a little bit earlier about whether either you or family members have been victims of a criminal offense, and [the court] also asked you about the nature of the charge in this case. [The court is] not asking you to disclose anything ***. [The court is] asking whether any of you have any family members or have had any circumstances, which could affect your ability to be fair and impartial in this case based upon the nature of the offenses charged?"

None of the venire members answered affirmatively. Shortly thereafter, the court permitted the State and defense counsel to question the panel.

- 6 -

¶ 32    After retiring the first 14 venire members to the jury room, the trial court asked a second panel of 14 venire members whether they or a family member had ever been the victim of a criminal offense. Two venire members answered affirmatively, recalling that the underlying circumstances of the respective cases they were referring to were similar to the instant case. Both prospective jurors acknowledged that based on their experiences with their respective cases, they could not be impartial jurors. As with the first panel, the court permitted the State and defense counsel to question the panel. Thereafter, the court dismissed for cause both venire members who called into question their impartiality. (The court dismissed two other venire members for cause because of a recent family death and the revelation that the prospective juror could not be impartial based on his former employment as a police officer.)

¶ 33    Based on proceedings conducted outside of the venire's presence, the trial court announced the 12 venire members selected as jurors and returned them to the jury room. Thereafter, the court questioned a panel of six venire members, intending to select an alternate juror. As with the prior two panels, the court asked if any venire member or a family member was charged with a criminal offense. One prospective juror expressed that although she did not "want to say it would affect [her] judgment," the circumstances "sicken[ ] me to the point I have an ache in the pit of my stomach," adding that she "already felt disgusted," "physically upset," and felt the need to "protect the child." The court subsequently dismissed the venire member for cause. The parties eventually selected an alternate juror.

¶ 34                                    D. The Evidence Presented

¶ 35    At defendant's October 2013 trial, the parties presented the following evidence to a jury. (Where possible, we omit detailed testimony that is repetitious because it is substantially similar to evidence presented at the February and July 2013 section 115-10 hearings.)

¶ 36                                    1. *The State's Evidence*

¶ 37    G.Z. testified that on the night of November 8, 2012, Stonewall interviewed her at her family's home. G.Z. told Stonewall that she had been wrestling with her siblings, Z.N., and defendant in the basement of her home earlier that day. Sometime later, G.Z. went to a hallway bathroom located on the home's first floor. After G.Z. relieved herself, defendant opened the bathroom door, entered, and turned off the lights. Defendant pulled down his pants, revealing his plaid boxers shorts, which he also removed. G.Z. moved and faced a corner of the bathroom "because I didn't know what he was going to do." Defendant then removed G.Z.'s shorts and underwear. At that moment, G.Z. felt "scared, like I didn't know what to do." G.Z. stated that defendant then placed "[h]is wiener against my butt" and "started moving back and forth or humping." G.Z. clarified that the terms "wiener" and "penis" meant the same thing.

¶ 38    G.Z. estimated that defendant continued humping her for about 15 to 20 minutes. During this time, defendant did not speak. G.Z. described the encounter as "warm, nasty, and uncomfortable," but it did not hurt. G.Z. eventually pushed defendant away because she "couldn't stand it anymore." Afterward, G.Z. put on her underwear and shorts and left the bathroom. Upon exiting, G.Z. noticed her stepfather, Austin, searching a closet located immediately across from the hallway bathroom. G.Z. attempted to "get [Austin] away" because G.Z. thought she would get in trouble. G.Z. told Austin about the spider, because she did not want him to enter the hallway bathroom. Afterward, G.Z. went into her bedroom, and Austin walked toward his master bedroom.

¶ 39    G.Z. noted that defendant left about 20 minutes after she entered her room, and Amber arrived home about an hour later. G.Z. acknowledged that she spoke with Amber about the bathroom incident, but G.Z. admitted that she did not disclose "everything" to Amber because "she didn't want anything bad to happen." G.Z. then testified generally to events that later occurred, which included (1) speaking with a police officer at her home, (2) giving police the underwear she wore during the bathroom encounter, (3) going to the hospital later that evening and speaking to a nurse, and (4) providing a tape-recorded statement to police the following day.

¶ 40    G.Z. revealed that the bathroom incident was not the first time defendant engaged in such behavior. On two occasions in August 2012, G.Z. and "other kids" were at defendant's home wrestling on the bed in defendant's bedroom. (During cross-examination, G.Z. admitted that although she thought the two incidents occurred in August 2012, she was "not sure.") When the other children left to play video games, G.Z. stayed with defendant. As in the November 2012 bathroom incident, G.Z. stated that the "same thing" happened in that defendant began "moving back and forth again," which G.Z. did not like. G.Z. stated that during these two encounters (1) they were both clothed, (2) she was lying on her stomach, and (3) defendant was on top of her. After the first incident, defendant told G.Z. that she shouldn't tell her parents. G.Z. acknowledged that during the November 2012 bathroom incident, she did not attempt to run past defendant or scream.

¶ 41    Kelly Biggs, a forensic scientist employed by the Illinois State Police crime lab, testified that deoxyribonucleic acid (DNA) testing she performed on vaginal and anal samples taken from G.Z. showed no male DNA was present.

¶ 42    Outside of the jury's presence, the trial court considered defendant's objection to the State's request to admit into evidence the recorded interview Damilano conducted with G.Z. Specifically, defendant averred that admitting and subsequently publishing the recording to the jury would be "obviously cumulative" and "highly prejudicial" given that (1) G.Z. had testified and was subject to cross-examination and (2) Damilano was scheduled to testify and would be subject to cross-examination. The State responded that Illinois jurisprudence does not place limits on the amount of section 115-10 evidence the State can proffer, provided the evidence meets certain reliability criteria. After considering the parties' arguments, the court overruled defendant's objection and admitted the recording into evidence. Thereafter, Damilano testified to the authenticity of the recording at issue, which was published to the jury.

¶ 43    Because the testimony provided at defendant's October 2013 jury trial by Austin, Amber, Stonewall, and Moment was substantially similar to the testimony each witness provided at the February and July 2013 section 115-10 hearings, we do not include it in this summary.

¶ 44                              2. *Defendant's Evidence*

¶ 45    Defendant testified that in November 2012, he was unemployed and would supervise Z.N. while Emily was at work. Because defendant considered the Hardys friends, he also watched their four children. Defendant's normal routine was to watch the Hardys' children from 11:30 a.m. until 4:45 p.m., when Austin would usually arrive home from work. Afterward, defendant would remain in the Hardys' home until Emily finished working, which usually occurred about 5:15 or 5:30 p.m. Defendant estimated that he had been supervising the Hardys' children for no more than three weeks.

¶ 46 Defendant stated that on November 8, 2012, he cared for the Hardys' children and Z.N. without incident. After Austin arrived home, defendant began preparing to leave with Z.N. During that time, defendant entered the hallway bathroom to relieve himself. Defendant "swung the door behind" him, but "it didn't shut." Although the lights in the bathroom remained off, natural light came "from the [kitchen] window," which was "located closest to the hallway." Defendant was then startled by G.Z.'s entrance into the bathroom. Defendant believed that G.Z. intended to use the bathroom because "her pants were down *** above her waist," which exposed "the top of her buttocks." Defendant became upset and told G.Z. "to get her ass out." G.Z. left the bathroom. When defendant left the bathroom, he encountered Austin. G.Z. had returned to the basement. Defendant then had a brief conversation with Austin concerning the slow-draining sink. Defendant denied touching G.Z. "in any way" during the bathroom incident.

¶ 47 E. The Jury's Verdict, Defendant's Posttrial Motion, and
the Trial Court's Sentence

¶ 48 Following its deliberations, the jury found defendant (1) not guilty of predatory criminal sexual assault of a child and (2) guilty of aggravated criminal sexual abuse. Later in November 2013, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. In support of his motion, defendant alleged, in pertinent part, that the trial court erred by (1) preventing him from inquiring whether potential jurors had been the victim of sexual abuse or had close friends or relatives who were victims of sexual abuse; (2) admitting G.Z.'s statements into evidence under section 115-10 of the Code because those statements were inconsistent and, thus, unreliable; and (3) admitting into evidence the audio and video recordings of G.Z.'s interview with Damilano as cumulative.

¶ 49 At an April 2014 hearing, the trial court considered defendant's November 2013 motion. As to defendant's first claim, the court noted, as follows:

"[T]he [prospective] jurors were asked if they or any family members [were] victims of the criminal offense. They were asked if the nature of the charges specifically affected their ability to be fair and impartial ***. There was nothing during *voir dire* that would indicate there would be any need for individual *voir dire*, nor was anything raised which would indicate that there was a need to conduct individual *voir dire*. *** [D]efendant was allowed to ask questions through counsel."

¶ 50 As to defendant's claims, which called into question the trial court's admission of (1) G.Z.'s statements under section 115-10 of the Code as unreliable and (2) the November 2012 recorded interview Damilano conducted with G.Z. as cumulative, the court noted that G.Z.'s statements were neither unreliable nor cumulative and were properly admitted pursuant to section 115-10 of the Code. Thereafter, the court sentenced defendant, in part, to four years in prison and imposed a $1250 fee for court-appointed counsel.

¶ 51 This appeal followed.

¶ 52 II. ANALYSIS

¶ 53 Defendant argues that (1) the trial court abused its discretion by admitting multiple hearsay statements the victim made to others pursuant to section 115-10 of the Code, (2) the court erred by prohibiting defense counsel from questioning venire members about personal experiences

they or their respective family members had with sexual abuse, and (3) this court should vacate the fee for court-appointed counsel that the trial court improperly imposed without first conducting a hearing as required by section 113-3.1 of the Code. We address defendant's arguments, in turn.

A. Admission of G.Z.'s Out-of-Court Statements
Under Section 115-10 of the Code

Elaborating on his section 115-10 evidentiary argument, defendant contends that the trial court denied him a fair trial because the admitted hearsay testimony was "consistent with both [G.Z.'s] trial testimony and her recorded interview with *** Damilano." Defendant also contends that the admitted hearsay testimony provided by Amber, Stonewall, Damilano, and Moment was unnecessarily cumulative and prejudicial. Thus, as framed by defendant, this court should reverse his aggravated criminal sexual assault conviction and remand for a new trial because the court's section 115-10 findings violated the rules prohibiting the admission of (1) prior consistent statements and (2) cumulative evidence. We disagree.

1. *Standard of Review*

"[T]he [trial] court's decision to admit evidence under section 115-10 will not be reversed unless the record clearly demonstrates that the *** court abused its discretion." *People v. Williams*, 193 Ill. 2d 306, 343, 739 N.E.2d 455, 474 (2000). An abuse of discretion occurs when the trial court's determination is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010).

2. *Prior Consistent Statements*

Illinois Rule of Evidence 613(c) (eff. Jan. 1, 2011), which governs prior consistent statements of a witness, provides, as follows:

"(c) Evidence of Prior Consistent Statement of Witness. A prior statement that is consistent with the declarant-witness's testimony is admissible, for rehabilitation purposes only and not substantively as a hearsay exception or exclusion, when the declarant testifies at the trial or hearing and is available to the opposing party for examination concerning the statement, and the statement is offered to rebut an express or implied charge that:

(i) the witness acted from an improper influence or motive to testify falsely, if that influence or motive did not exist when the statement was made; or

(ii) the witness's testimony was recently fabricated, if the statement was made before the alleged fabrication occurred."

" 'In general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony.' " *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99, 5 N.E.3d 328 (quoting *People v. House*, 377 Ill. App. 3d 9, 19, 878 N.E.2d 1171, 1179 (2007)); see also *People v. Heard*, 187 Ill. 2d 36, 70, 718 N.E.2d 58, 77 (1999). The rationale underlying this prohibition has been explained, as follows:

" 'The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated

most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve.' " *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52, 974 N.E.2d 352 (quoting *People v. Smith*, 139 Ill. App. 3d 21, 33, 486 N.E.2d 1347, 1355 (1985)).

¶ 61    In this case, the trial court admitted the contested statements at issue pursuant to section 115-10 of the Code. That statutory provision, entitled, "Certain hearsay exceptions," provides, as follows:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 *** at the time the act was committed, including but not limited to prosecutions for violations of Sections 11-1.20 through 11-1.60 *** of the Criminal Code of *** 2012 ***, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" 725 ILCS 5/115-10(a), (b) (West 2012).

See Pub. Act 82-782 (eff. Jan. 1, 1983) (adding Ill. Rev. Stat. 1983, ch. 38, ¶ 115-9); see also Pub. Act 82-1057 (eff. Feb. 11, 1983) (renumbering and amending Ill. Rev. Stat. 1983, ch. 38, ¶ 115-9 to ¶ 115-10, now codified at 725 ILCS 5/115-10).

¶ 62    In *People v. Holloway*, 177 Ill. 2d 1, 9-10, 682 N.E.2d 59, 63 (1997), the supreme court explained that the legislature enacted section 115-10 of the Code to address the following concerns:

"Section 115-10 was originally passed in response to the difficulty in convicting persons accused of sexually assaulting young children. This difficulty occurs because children's testimony in sexual assault cases is often inadequate. Problems in proof may result when the lesser developed cognitive and language skills that children have hinder them in adequately communicating the details of an assault. The legislature sought to create a hearsay exception to allow into evidence corroborative testimony that the child complained to another person about the incident.

***

It appears that the legislature, in providing for the admission of evidence of outcry statements as exceptions to the hearsay rule in certain cases, was concerned with the ability of the victim to understand and articulate what happened during the incident and

the reluctance many victims have relating the details of the incident at trial. Evidence of an outcry statement made to another by a child under the age of 13 would corroborate the testimony of a child who, by reason of age, may be reluctant or unable to clearly express the details of the incident. *** The importance of allowing hearsay testimony of an outcry *** is not dictated by the age of the victim when the assault occurs. Instead, it is dictated by the victim's ability to adequately testify to the alleged incident."

See also *People v. Bowen*, 183 Ill. 2d 103, 115, 699 N.E.2d 577, 584 (1998) (The General Assembly enacted section 115-10 of the Code to allow admission of "detailed corroborative evidence of the child's complaint about the incident to another individual" out of concern that "child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial.").

¶ 63 Defendant's contention that the admitted section 115-10 hearsay testimony at issue violated the prohibition against utilizing prior consistent statements as substantive evidence is unavailing because by its very nature, section 115-10 of the Code constitutes an exception to that rule. Based on the rationale underpinning its enactment, the plain language of section 115-10 of the Code provides for the admission, in relevant part, of "testimony of an out of court statement" made by the minor victim that is solicited from a witness who directly heard the minor making the statement. 725 ILCS 5/115-10(a)(2) (West 2012). Thus, admission of out-of-court statements, such as those G.Z. conveyed to Amber, Stonewall, Damilano, and Moment concerning the surrounding circumstances of defendant's sexual contact, is "measured only by whether they meet the [reliability] requirements of section 115-10 of the Code." (Emphasis omitted.) *People v. Sharp*, 391 Ill. App. 3d 947, 954, 909 N.E.2d 971, 977 (2009). See *People v. Cookson*, 335 Ill. App. 3d 786, 791, 780 N.E.2d 807, 811 (2002) ("The State bears the burden of proving that the statements were reliable and not the result of adult prompting or manipulation.").

¶ 64 To accept defendant's premise—which we do not—would signify that section 115-10 of the Code permits the admission of specific hearsay declarations as substantive evidence solely when a minor under 13 years old testifies inconsistently with the identified corroborative hearsay statements the minor conveyed to others. The aforementioned plain language of the statute does not support defendant's stance. Moreover, we note that the legislature could not have intended for section 115-10 of the Code to operate in such a fashion because 18 months after enactment of what is now known as section 115-10 of the Code, the legislature enacted section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2012)) with the heading, "Admissibility of Prior Inconsistent Statements." See Pub. Act 83-1042 (eff. July 1, 1984) (adding Ill. Rev. Stat. 1985, ch. 38, ¶ 115-10.1, now codified at 725 ILCS 5/115-10.1); see also *People v. Davis*, 137 Ill. App. 3d 769, 771-72, 484 N.E.2d 1098, 1100 (1985) (acknowledging the enactment of section 115-10.1 of the Code). "[I]t is presumed [that] the legislature acts rationally and with full knowledge of all prior legislation." *People v. Jones*, 214 Ill. 2d 187, 199, 824 N.E.2d 239, 246 (2005).

¶ 65 Defendant correctly notes that section 115-10 of the Code is a specific hearsay exception tailored to minors under 13 years old who have been victims of a sexual offense for the reasons stated in *Holloway* and *Bowen*. Defendant's position, however, that corroborative hearsay statements are barred from admission under section 115-10 of the Code if they are consistent with a minor's trial testimony reveals a fundamental misunderstanding of the following two

principles. First, that the admission of out-of-court statements under section 115-10 of the Code is predicated on the trial court's judgment as to the reliability of the corroborative hearsay statements. Second, and more important, provided that the remaining provisions of section 115-10 are satisfied, whether a minor victim testifies consistently, inconsistently, or by not responding to questions posed regarding the sexual acts alleged does not affect the admissibility—under section 115-10—of the minor's out-of-court statements to others that detailed a defendant's sexual acts. See *People v. Bryant*, 391 Ill. App. 3d 1072, 1083, 909 N.E.2d 391, 401 (2009) (affirming the admission of the minor victim's hearsay statements to others pursuant to section 115-10 of the Code despite the minor's unwillingness or inability to testify on direct examination about specific sexual conduct the defendant forced the minor to perform).

¶ 66       In *Stull*, 2014 IL App (4th) 120704, 5 N.E.3d 328, this court addressed essentially the same argument that defendant makes in this case. We rejected that argument in *Stull* (*id.* ¶¶ 96-101), and we reiterate that rejection here. As we wrote in *Stull*, "When *** a prior statement is offered at trial as *substantive* evidence under an exception to the hearsay rule, the mere fact that the statement is consistent with the declarant's trial testimony does not render that prior statement no longer admissible." (Emphasis in original.) *Id.* ¶ 100. Accordingly, in the context of a section 115-10 hearing, the rule proscribing the admission of a witness's prior consistent statements has no application whatsoever. Therefore, we reject defendant's argument.

¶ 67                                    3. *Cumulative Evidence*

¶ 68       In *Stull*, this court cited numerous cases in which the appellate court addressed and consistently rejected the argument defendant now raises—that is, that the hearsay statements the trial court admitted under section 115-10 of the Code were unnecessarily cumulative and prejudicial. *Id.* ¶ 93. See *People v. Greenwood*, 2012 IL App (1st) 100566, ¶ 31, 971 N.E.2d 1116 (rejecting the defendant's argument that the trial court erred by admitting hearsay statements of multiple witnesses pursuant to section 115-10 and collecting cases in support of that conclusion); *People v. Lofton*, 303 Ill. App. 3d 501, 508, 708 N.E.2d 569, 574 (1999) (rejecting the defendant's argument that the trial court's admission of evidence provided by four witnesses regarding the victim's out-of-court statements was cumulative and served to bolster the State's case because section 115-10 places no limitations on the number of witnesses who may testify under its strictures); *People v. Moss*, 275 Ill. App. 3d 748, 756, 656 N.E.2d 193, 199 (1995) (declining to limit hearsay testimony admissible under section 115-10 to one witness because the statute contains no such limitation); *People v. Branch*, 158 Ill. App. 3d 338, 341, 511 N.E.2d 872, 874 (1987) (section 115-10 does not limit the number of witnesses corroborating the victim's complaint to one).

¶ 69       Defendant acknowledges *Greenwood*, *Lofton*, and *Moss*, but, citing *dicta* in *People v. Anderson*, 225 Ill. App. 3d 636, 587 N.E.2d 1050 (1992), asserts that the cumulative nature of the section 115-10 statements the State presented at his jury trial tilted the scales of justice against him in what defendant claims was a closely balanced case.

¶ 70       In *Anderson*, the defendant argued that "he was denied a fair trial by the repetition of *** statements by three witnesses" admitted under section 115-10 of the Code. *Id.* at 648, 587 N.E.2d at 1059. In rejecting that argument, the appellate court quoted, in part, the following passage:

" 'Youthful victims often suffer an inability to articulate on the witness stand or lack credibility in general. Their complaints obviously become more credible, reliable and understandable when supported by corroborative complaint testimony from adults. Those who are close to the victim or who have interviewed the victim and investigated the alleged incidents should not be curtailed from testifying and aiding the victim merely because of their numbers or order of talking with the victim.' " *Id.* (quoting *Branch*, 158 Ill. App. 3d at 341, 511 N.E.2d at 873-74).

¶ 71    After finding the analysis in *Branch* dispositive of the defendant's argument, the *Anderson* court continued, as follows:

"However, we caution that in some future case where the evidence is more closely balanced we would not hesitate to grant a defendant a new trial if it appears that the delicate scales of justice have been unfairly tilted by the sheer weight of repetition. We trust in the sound discretion of the trial courts to maintain the proper balance by limiting evidence which is unnecessarily cumulative." *Id.*

¶ 72    We note that in quoting the aforementioned *dicta* in *Anderson* to support his assertion, defendant did not include the last sentence regarding our deferential review of the trial court's section 115-10 evidentiary ruling. In essence, defendant is asking this court to set aside the trial court's judgment and implement our own by concluding that the trial court abused its discretion when it admitted the corroborative hearsay statements G.Z. conveyed to Amber, Stonewall, Damilano, and Moment because they were unnecessarily cumulative and, by extension, prejudicial. Under the facts presented, however, we have no reason to conclude that the trial court's decision to admit the section 115-10 statements at issue constituted an arbitrary, fanciful, or unreasonable determination that no reasonable person would agree was sound.

¶ 73    In so concluding, we note that in raising this argument, defendant implies that section 115-10 should be narrowly construed so as not to violate the rule against cumulative evidence. In *People v. Johnson*, 2016 IL App (4th) 150004, ¶¶ 40-45, 55 N.E.3d 32, we specifically rejected any notion that current Illinois jurisprudence requires section 115-10 to be narrowly construed. To the extent defendant is claiming otherwise, we reaffirm and adhere to our conclusion in *Johnson*.

¶ 74    As we have previously mentioned, section 115-10 of the Code allows for the admission of a hearsay statement conveyed to another person by a victim of a sexual crime who is under the age of 13 years old "if, among other things, the trial court 'finds in a hearing' that 'the time, content, and circumstances of the statement provide sufficient safeguards of reliability.' " *Id.* ¶ 48 (quoting 725 ILCS 5/115-10(b)(1) (West 2014)). Because defendant has not challenged the court's reliability determinations, we reject defendant's section 115-10 challenges.

¶ 75                                   B. Jury Selection

¶ 76    Defendant argues that the trial court erred by prohibiting defense counsel from questioning venire members individually about personal experiences they or their family members had with sexual abuse. Defendant contends that the court (1) impermissibly denied defense counsel's request to directly question prospective jurors to uncover their "deep[-]seated biases and prejudice" and (2) did not consider the factors in Illinois Supreme Court Rule 431(a) (eff. July 1, 2012) when it denied defendant's request to directly question prospective jurors. We disagree.

¶ 77      Rule 431(a) provides the following guidance:

"The court shall conduct *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate, touching upon their qualifications to serve as jurors in the case at trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate and shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of examination by the court, the complexity of the case, and the nature of the charges. Questions shall not directly or indirectly concern matters of law or instructions. The court shall acquaint prospective jurors with the general duties and responsibilities of jurors." Ill. S. Ct. R. 431(a) (eff. July 1, 2012).

¶ 78      In *People v. Mabry*, 398 Ill. App. 3d 745, 754, 926 N.E.2d 732, 740 (2010), the First District succinctly set forth the following pertinent standard of review:

"It is axiomatic that the manner and scope of *voir dire* rest within the sound discretion of the trial court. [Citation.] In conducting the *voir dire*, the trial court is accorded broad discretion in determining which questions will be asked and which procedures will be followed. [Citation.] The trial court should always exercise its discretion in a manner that is consistent with the goals of *voir dire*—to assure the selection of an impartial jury, free from bias or prejudice, and grant counsel an intelligent basis on which to exercise peremptory challenges. [Citation.] Upon review, the standard for evaluating a court's exercise of discretion during the *voir dire* is whether the questions and procedures created reasonable assurance that any prejudice or bias would be discovered. [Citation.]"

¶ 79      Based on the record in this case, we find unavailing defendant's claims that the *voir dire* procedures the trial court employed—which included the specific questions the court posed to three separate panels of venire members—were deficient, which would, by extension, cast doubt upon the impartiality of the empanelled jurors. In support of his contentions, defendant directs our attention to *People v. Oliver*, 265 Ill. App. 3d 543, 637 N.E.2d 1173 (1994).

¶ 80      In *Oliver*, the trial court asked the entire panel of seated venire members to rise if they had been a victim of armed robbery, rape, sexual assault, or had a friend or relative who had been the victim of a homicide. *Id.* at 549, 637 N.E.2d at 1178. Out of the approximately 15 to 20 venire members that stood up, the court excused one prospective juror. *Id.* at 550, 637 N.E.2d at 1178. The appellate court reversed and remanded for a new trial, finding as follows:

"While the trial court's procedure was to ask about the specific crimes involved in this case, the trial court abused its discretion. It merely asked questions but did not permit the jurors to respond individually. Nor was defense counsel afforded the opportunity to make a determination as to whether jurors were biased or impartial." *Id.*

We do not agree with defendant's assertion that the circumstances presented in *Oliver* are "strikingly analogous" to the facts of the instant case.

¶ 81      Here, an experienced trial judge employed a *voir dire* procedure that balanced the dignity afforded prospective jurors with regard to their reasonable expectations of privacy with the primary purpose of a *voir dire* examination, which is to exclude prospective jurors who are unwilling or unable to be impartial arbiters. In so doing, the trial court posed specific questions tailored to elicit responses from manageable panels, which the court was prepared to explore if,

in the court's judgment, further questioning was warranted. Indeed, when appropriate, the court did ask additional focused questions that permitted individual venire members to expand on their initial answers. At no time did the court prohibit the State or defense counsel from proffering supplemental questions on the sensitive issue of a venire member's personal experiences with sexual crimes. The only requirement the court mandated was that the parties had to submit any proposed questions to the court, which we (1) do not find unreasonable and (2) note defendant did not utilize.

¶ 82    Despite defendant's claims to the contrary, we are satisfied that not only was the *voir dire* procedure the trial court implemented in accord with Rule 431(a), but it also created reasonable assurances that any prejudice or bias would have been discovered, as demonstrated.

¶ 83                              C. Fee for Court-Appointed Counsel

¶ 84    Defendant argues that this court should vacate the fee for court-appointed counsel that the trial court improperly imposed without first conducting a hearing as mandated by section 113-3.1 of the Code. We agree.

¶ 85                    1. *Section 113-3.1 of the Code and the Standard of Review*

¶ 86    Section 113-3.1(a) of the Code provides, as follows:

> "Whenever *** the court appoints counsel to represent a defendant, the court may order the defendant to pay to the Clerk of the Circuit Court a reasonable sum to reimburse either the county or the State for such representation. In a hearing to determine the amount of the payment, the court shall consider the affidavit prepared by the defendant under Section 113-3 of this Code and any other information pertaining to the defendant's financial circumstances which may be submitted by the parties. Such hearing shall be conducted on the court's own motion or on motion of the State's Attorney at any time after the appointment of counsel but no later than 90 days after the entry of a final order disposing of the case at the trial level." 725 ILCS 5/113-3.1(a) (West 2012).

¶ 87    We review *de novo* whether a trial court complied with section 113-3.1 of the Code when imposing a fee for court-appointed counsel. *People v. Gutierrez*, 2012 IL 111590, ¶ 16, 962 N.E.2d 437.

¶ 88                    2. *The Pertinent Portions of Defendant's Sentencing Hearing*

¶ 89    At defendant's April 2014 sentencing hearing, the following exchange occurred:

> "[THE STATE]: [The State has] marked *** People's 1 ***. The Public Defender's Office filed an affidavit of services ***. Ask to admit People's 1.
>
> THE COURT: Any objections.
>
> [DEFENSE COUNSEL]: Yeah, we do, object, Judge. I'm not sure why the State's seeking to admit People's 1.
>
> THE COURT: *** [T]he State represents the County. The County incurs expenses when the Public Defender's Office is appointed to represent an individual, and they represented [defendant] for a period of time before you entered your appearance. ***
>
> [DEFENSE COUNSEL]: Well, I guess there could be attached some sort of order for sentencing. I do have an assignment of bond that covered my fees ***.

THE COURT: [The court] understand[s]."

¶ 90 Shortly thereafter, the court imposed the following sentence:

"It will be the judgment and sentence of the court that [defendant] be sentenced to the Illinois Department of Corrections for a period of four years. *** There is a two-year period of mandatory supervised release to that sentence.

The bond assignment will be honored.

You are also indebted to the County in the amount of $1,250. That's not to be taken from the bond assignment."

¶ 91                                    3. *The Controversy at Issue*

¶ 92 Defendant contends that because the trial court failed to conduct even a slight inquiry into defendant's financial circumstances, the $1250 fee for court-appointed counsel that the court improperly imposed must be vacated outright. The State concedes that the court failed to conduct a proper section 113-3.1 hearing but asserts that this court should remand the matter for a proper hearing instead of vacating the fee outright as defendant advocates. In support of its position, the State relies on *People v. Somers*, 2013 IL 114054, ¶ 14, 984 N.E.2d 471.

¶ 93 In *Somers*, the supreme court considered whether section 113-3.1(a) of the Code authorized the appellate court to remand for a rehearing on the defendant's ability to pay a fee for court-appointed counsel if more than 90 days had elapsed since the entry of the trial court's final judgment. *Id.* ¶ 9. In addressing that issue, the supreme court focused on the trial court's attempt to comply with section 113-3.1(a) of the Code by conducting a hearing within the aforementioned 90-day period that the appellate court later determined to be insufficient. *Id.* ¶ 13. Specifically, the trial court conducted a hearing at which the court asked the defendant three questions concerning his employment status. *Id.* ¶ 4. Based on the defendant's answers, the court imposed a $200 fee for court-appointed counsel. *Id.*

¶ 94 On appeal, the supreme court affirmed the appellate court's remand for a proper public-defender-fee hearing under section 113-3.1(a) of the Code (*id.* ¶ 20), concluding that the trial court's questions about defendant's employment status were insufficient to satisfy section 113-3.1(a) of the Code (*id.* ¶ 14). The supreme court continued, as follows:

"Clearly, then, the trial court did not fully comply with the statute, and defendant is entitled to a new hearing. Just as clearly, though, the trial court did have some sort of a hearing within the statutory time period. The trial court inquired of defendant whether he thought he could get a job when he was released from jail, whether he planned on using his future income to pay his fines and costs, and whether there was any physical reason why he could not work. Only after hearing defendant's answers to these questions did the court impose the fee. Thus, we agree with the State's contention that the problem here is not that the trial court did not hold a hearing within 90 days, but that the hearing that the court did hold was insufficient to comply with the statute." *Id.* ¶ 15.

¶ 95 As noted, the controversy does not concern whether the trial court improperly imposed the $1250 fee for court-appointed counsel. Both parties agree on this point, and based on this record, we accept the parties' concession. Instead, the issue before us concerns whether this court should (1) vacate the fee for court-appointed counsel outright as defendant urges or (2) remand the matter for a rehearing that complies with section 113-3.1(a) of the Code as the State advocates. Defendant contends that *Somers* is distinguishable because, contrary to the State's

- 17 -

assertion, the court never questioned him about his employment status, financial situation, or ability to pay a fee for court-appointed counsel. Instead, the court imposed the $1250 fee for court-appointed counsel. We do not agree with defendant that *Somers* is distinguishable because the supreme court could have easily stated "some sort of a hearing" must at minimum include a slight inquiry about the defendant's ability to pay the fee, but it did not do so. *Id.*

¶ 96    In this case, defendant appeared before the trial court with his retained counsel after having been initially represented by the public defender. The State sought to introduce the public defender's affidavit of services on defendant's behalf, and defendant's retained counsel and the court discussed defendant's posting of bond. This exchange between defendant's retained counsel and the court *did* constitute "some sort of a hearing." *Id.* Although the hearing was inadequate, the situation here is distinguishable from one where a court *sua sponte* addresses and assesses a fee in a docket entry or written order. See *People v. Aguirre-Alarcon*, 2016 IL App (4th) 140455, ¶ 17, 59 N.E.3d 229 (where the court *sua sponte* assessed a fee for court-appointed counsel in a supplemental sentencing order without the parties' knowledge).

¶ 97    Accordingly, we vacate the trial court's imposition of $1250 fee for court-appointed counsel and remand with directions that the court conduct a hearing pursuant to section 113-3.1 of the Code.

¶ 98                                    III. CONCLUSION

¶ 99    For the foregoing reasons, we affirm defendant's conviction, vacate defendant's $1250 fee for court-appointed counsel, and remand for further proceedings.

¶ 100    Affirmed in part and vacated in part; cause remanded.

¶ 101    JUSTICE TURNER, specially concurring.

¶ 102    While I concur in the majority's opinion, I write separately to express that I take no part in the majority's brief discussion in paragraph 73. It is unnecessary for the resolution of this case and contrary to the views that I have previously expressed regarding the issue of construing section 115-10. See *Johnson*, 2016 IL App (4th) 150004, ¶¶ 92-95, 55 N.E.3d 32 (Turner, J., specially concurring).